NOSLER v. THE CHICAGO, BURLINGTON & QUINCY R'Y CO.

1. **Railroads**: TEAM KILLED AT STREET CROSSING: EVIDENCE: SUR-
ROUNDINGS.   In an action against defendant for negligently running its
train against plaintiff's horses and wagon at a street crossing in the city
of Ottumwa, *held* that evidence of the number of residences south of
the railroad was properly admitted, when offered by plaintiff, for the
purpose of showing the exact situation and surroundings, as bearing on
the question of negligence in running the train.

2. ——: ——: ——: CARE IN LOOKING FOR TRAIN.   In such case it
appeared that the crossing of the Rock Island road was only a short
distance from that at which the accident occurred, and that when at the
Rock Island crossing the persons in charge of the team could have seen
along the defendant's track in the direction from which the train was
coming for several hundred feet, but that for a portion of the distance
between the tracks they could not see the track for so great a distance.
*Held* that it became material for plaintiff to show how long it would
take a team of horses to walk from the Rock Island crossing to where
the accident occurred, and that evidence of experiments made to ascer-
tain that fact was admissible.

3. ——: ——: ——: DAMAGES.   In such case, where there was evi-
dence that the horses killed were adapted to draying and hauling heavy
loads, it was not error to admit evidence as to the worth of the horses
for such work.

4. ——: ——: ——: MAP OF CITY.   Nor was it error in such case to
admit in evidence a map of the city shown to be recognized and used
by the city as substantially correct.   (Code § 3653.)

5. **Practice**: ADMISSION AS TO CLAIM OF PETITION: ESTOPPEL: INSTRUC-
TIONS.   Where the petition by a fair construction charged general negli-
gence in operating a train, and the cause was tried by court and counsel on
that issue, a statement by plaintiff's counsel, in an argument against
the admission of evidence, that nothing was claimed except negligence
in one particular, *held* that such statement did not estop plaintiff from
afterwards claiming general negligence, (Compare *Frederick v. Gaston*,
1 G. Greene, 401,) and that the court properly instructed on the general
issue presented by the petition.   (See, also, par. 6 of opinion.)

6. **Railroads**: TEAM KILLED ON STREET CROSSING: EVIDENCE: CARE OF
ENGINEER: OPINION.   In an action for the value of a team killed by a
train at a street crossing, the engineer was asked as a witness whether
he did everything he could from the time he saw the team was likely to
be struck till it was struck.   *Held* that the question called for an opinion
only, and that it was properly excluded.

7. ——: DUTY OF ONE CROSSING TRACK. "LIMITS OF ACTUAL DANGER."

In this case the court instructed the jury that from the time one about to cross a railroad track enters within the "limits of actual danger" until he leaves them, he must exercise ordinary care to avoid it. *Held* that the words "limits of actual danger," as used by the court, meant the time when and the place where it became the person's duty to look and listen for an approaching train, and that the instruction, when considered with others given, did not mislead the jury on account of the use of these words.

8. ——: ——: NEGLIGENCE: QUESTION FOR JURY. Ordinarily a person approaching a railroad crossing should both look and listen, and, if necessary, stop his team, and listen for an approaching train; but to this rule there are exceptions; and in this case, where plaintiff's team was struck by a train, at a street crossing, in the day time, the question whether his employes in charge of the team were or were not guilty of contributory negligence in failing to stop and look and listen for the train, was properly submitted to the jury, to be determined from the facts of the case. (The facts are fully stated in the opinion.)

*Appeal from Wapello Circuit Court*—HON. DELL STUART, Judge.

THURSDAY, OCTOBER 27.

THE petition states that there is an ordinance in the city of Ottumwa making it unlawful to run a railroad train through the city at a greater rate of speed than six miles an hour, but that the defendant, disregarding such ordinance, and in a reckless and negligent manner, ran its "fast U. S. mail train," going west on its road, at the speed of thirty miles an hour, within the corporate limits of said city, without ringing the bell, or sounding the whistle; and that at a place in said city where Tisdale street, in said city, crosses defendant's road, recklessly and negligently ran said train against plaintiff's team and killed both of his horses, and broke and damaged his wagon and harness. The allegations of the petition were denied, and the contributory negligence of the persons in charge of the team was pleaded by the defendant. Trial by jury, verdict and judgment for the plaintiff, and the defendant appeals.

*David C. Beaman,* for appellant.

*Chambers & McElroy* and *Williams & Jaques,* for appellee

SEEVERS, J.—Counsel for the appellant, in argument, concede that the contributory negligence of the persons in charge of the team is the material issue in the case, yet it is claimed that the court erred in the admission or rejection of evidence which had little, if any, bearing on such question, or upon the merits of the controversy. Nevertheless, we shall briefly consider them, for the reason that counsel seem to believe that the rulings of the court in the respects mentioned constitute prejudicial error.

I.   The plaintiff was permitted to prove the number of residences south of the railroads in Ottumwa.   It is said that this is erroneous, because there is no allega-

1. RAILROADS: team killed at street crossing: evidence: surroundings.

tion in the petition that by reason of the peculiar surroundings the defendant was required to operate the train with greater care than usual. But we think it was proper to show all the surroundings, and, as far as could be, to show the exact situation, so that the jury could determine whether the defendant had exercised such degree of care as it was required to do under the existing circumstances and conditions.

II.   The plaintiff was allowed to introduce evidence tending to show, by experiments made, how long it would take a

2. ——: ——: ——: care in looking for train.

team of horses to walk from the Rock Island crossing to the place where the accident occurred. It is conceded that when the persons in charge of the teams were at the crossing they could have seen along the defendant's track for several hundred feet in the direction the train was coming.   There was evidence tending to show that for a portion of the distance between the two tracks, because of existing buildings, they could not see the track or train as far as could be done at said crossing.   It became material, therefore, to ascertain what length of time a team of horses would require to walk the distance between the Rock Island track and where the accident occurred, and also to determine the speed of the train.   The Rock Island crossing was well known and permanent.   There could be no

mistake as to the distance between the two tracks. The experiments were made by timing the train with a stop-watch, and a team of horses walking from the crossing to the place of the accident. We think the evidence was admissible, and that the case is distinguishable from *Klanowski v. Grand Trunk R'y Co.*, (Mich.,) 31 N. W. Rep., 275, for the reason that the experiments were carefully made, and there was no doubt as to the starting point at the crossing.

III. One Doran was asked what the horses were worth for draying and hauling heavy loads. This question was

**3. —: —: —: damages.** objected to and the objection overruled. There was evidence tending to show that the horses were adapted to, and suitable for, the purposes stated. We fail to see any valid objection to the evidence.

IV. A map of the city of Ottumwa, purporting to have been made by H. L. Waterman, city engineer, was offered in

**4. —: —: map of city.** evidence, and it was proved that the map was recognized and used in the city as substantially correct. Against the objection of the defendant, the map was introduced in evidence. In so ruling the court did not err. (Code, § 3653.)

V. The defendant sought to prove that the engineer was a careful man, but the court refused to allow the evidence to

**5. PRACTICE: admission as to claim of petition: estoppel: instructions.** be introduced, upon the theory, we may suppose, that such fact had no tendency to prove that he was not negligent on this particular occasion. The defendant offered to prove that the engineer did not run his train any faster than did other engineers of the "fast mail." To this counsel for the plaintiff objected, and stated: "No complaint is made of any negligence in the engineer, further than that he was running faster than authorized by law." The court said: "The plaintiff has introduced proof tending to show that this engineer runs his engine different from others. * * * Now it is right that the other parties have their version." The evidence was therefore admitted, and of this the defendant does

not complain; but it is insisted that what counsel said is a "fair construction of the petition," and that he was bound by the statement of his counsel, and therefore the admission of evidence on the ground that there was an issue of "general negligence" was erroneous. If such evidence was admitted, counsel for the defendant failed to object to it. The case seems to have been tried by both court and counsel upon the theory that the engineer was charged in the petition with general negligence, and we think such is the fair construction of the petition. Besides this, we do not think the admission made by counsel was, under the circumstances, binding on the plaintiff. It cannot be said that the plaintiff was estopped thereby. (*Frederick v. Gaston*, 1 G. Greene, 401.)

The engineer testified that he was about 200 feet from the crossing when he saw the team approaching and he said: "Very frequently they come within ten or fifteen feet, and then stop. I was not doing anything towards stopping the engine. When they got about ten or fifteen feet from the railroad, I saw they were not going to stop, so I gave the alarm signal with the whistle. Think the whistle was open till the horses were struck. I set the air-brake with one hand, and, after I let go the whistle with the other hand, I reversed the engine about the time I struck the team. Am not sure about giving steam in the back motion. Did all there was time to do." Thereupon he was asked by counsel for the defendant to state " whether or not you did everything you could, from the time you discovered the team was likely to be struck until it was struck.". An objection to this question was properly sustained, for the reason that it asked for the opinion of the witness; and, besides this, he had just stated all he did, and in fact answered the question. The court therefore, did not err in overruling the question asked.

<small>6. RAILROADS: team killed on street crossing: evidence: care of engineer: opinion.</small>

VI. In the same connection, the counsel for the appellant contends that the case should have been submitted to the jury on the theory that the only negligence claimed was that the train was running faster than authorized by law. This claim is based on the statement of counsel, above set out, to the effect that this is all that was claimed. But the court submitted to the jury the question whether the engineer was negligent in not stopping, or attempting to stop, the train sooner than he did. Counsel for the appellant claim there was no such issue, and that, because counsel for the plaintiff made the statement they did, therefore such issue should not have been presented to the jury. The case, as we have said, was tried on the theory that there was such an issue. Evidence was introduced on both sides bearing thereon, and this the defendant did after the statement was made. In fact, such statement was not accepted and acted upon; on the contrary, it was ignored by the defendant; and therefore the court did not err in submitting such issue to the jury. Therefore the eleventh, twelfth, thirteenth and fourteenth paragraphs of the charge are not vulnerable to the objections urged by counsel.

*See No. 5, ante.*

VII. The twenty-second paragraph of the charge is objected to, but it is in substance the same as an instruction in *Correll v. Burlington, C. R. & M. R'y Co.*, 38 Iowa, 120, which was approved by this court.

VIII. The court instructed the jury as follows: "(23) A railroad crossing is a place of known danger, and every man who approaches it for the purpose of crossing must know this fact, and must use his own senses and efforts to avoid the danger, and not depend on the railroad company to warn him thereof. This, of course, applies to a person who is acquainted with the crossing and locality. While he has a right to assume that the railroad company will perform the duties required of it by law, yet he must also know that a failure to do so simply

*7. ———: duty of one crossing track: "limits of actual danger."*

raises a presumption of negligence on its part, and not of care on his part. The law that requires these duties by the railroad company does not release him from his duties. From the time that he enters within the limits of actual danger until he leaves them, he must exercise ordinary care to avoid it. Different cases would require different efforts. At one time he might listen, while at another time he should both look and listen; and at another time he should stop and look and listen. His senses of seeing and hearing are his main reliance at such a time. He should not depend on them if he knows they are obstructed, but see that they are exercised at a time and place where they may not be deceived. (24) In this case, it is for you to say what the men in charge of the team should have done in order to bring them within the use of ordinary care. (25) If you find, from the evidence, that they used ordinary care to discover approaching trains while approaching and driving upon said crossing, then you should find on this point for the plaintiff."

Counsel for the defendant take exceptions to the portion of the foregoing instructions referring to the time a person enters into the limits of actual danger. It is not entirely clear what the court meant, or the jury must have understood, were the "limits of actual danger;" but, taking the instructions all together, our conclusion is that the meaning of the court included the approach to the track. We are inclined to think that, ordinarily, a person would not be in actual danger from an approaching train until he was on the railroad track; but clearly the court did not mean this, and that from such time only he was required to exercise ordinary care. The court must have meant that the limits of actual danger included the time when, and the place where, it became his duty to look and listen for an approaching train; and, taking the instructions together, we think they are correct, and that the defendant was in no respect prejudiced by the portion objected to.

The Rock Island tracks and those of the defendant are

parallel to each other, the former being north of the latter;
the distance between them being about 100 feet.
Tisdale street, in Ottumwa, crosses the tracks of
both roads. The plaintiff was the owner of a

*[margin note: 3. ——: ——: negligence: question for jury.]*

team and ice wagon in charge of two employes, named Far-
rington and Switzer, who were riding in the wagon, and they
were going south along Tisdale street. Farrington was driv-
ing, and Switzer was seated by his side. The accident
occurred in the day-time, and both of said employes were
acquainted with the crossing, and had passed over the same
several times a day for a considerable period of time. There
was no wind. Between the tracks, and near the place where
the accident occurred, was a building known as the " Cut-
lery." The train was coming from the east. The evidence
tended to show that when a person was on the Rock Island
crossing he could see along the track in the direction the
train was coming for about 1,100 feet, except that for about
500 feet of the westerly part thereof the view of the train
from that point was obstructed by the " Cutlery."

Farrington testifies that when he was at the Rock Island
crossing he "looked particularly for a train both ways [that
is, both east and west] on the defendant's road. After you
cross the Rock Island, you cannot see much of the defend-
ant's road, for the 'Cutlery' shuts off the view on one side,
and some shanties on the other. *      *      * After pass-
ing the 'Cutlery,' I looked west for a train. There are trains
coming all times, and I didn't know what time it was. I
looked west, then east. Saw the train just as Switzer spoke.
There was no reason why I looked west first. He said, 'My
God! Tom, there is a train right on us!' and I pulled up on
the lines. The horses had got their fore feet on the first rail.
I saw the train was on me, and I had no time to do anything
but jump. When I first saw the train it must have been
within twenty feet of the horses."

Switzer testifies that when they were on the Rock Island
crossing he looked " towards town to see whether the train

was coming on both tracks, and seen there was not, and I then looked west, and seen there was none.   We kept right on, and when the team went across the track I turned to see whether the train was coming on the defendant's road, and I said, 'My God! Tom, here is a train!' etc.   *     *     *   I could not say exactly how close the train was, but it was down by this end of the 'Cutlery,' about.   It was coming awfully fast."

The evidence tended to show that from the time the team passed the Rock Island crossing the horses walked to the place of the accident, and that it took about fifteen seconds to travel such distance.   There was a conflict in the evidence as to whether the bell was ringing, and the evidence tended to show that it was usually rung when approaching the crossing.   The evidence as to the speed of the train was conflicting, but it was from about 20 to 30 miles an hour, and the jury would have been warranted in finding in favor of one or the other.

The engineer testified:  " I was about 180 or 200 feet from Tisdale street crossing when I first saw the team.   It was approaching the crossing, coming from behind the cutlery building.   Just could see their necks and heads.   Very frequently they come within ten or fifteen feet, and then stop, so I was not doing anything towards stopping the engine.   When they got about that distance from the railroad, I saw they were not going to stop, so I gave the alarm signal with the whistle."

We have stated the facts fully, for the reason that the defendant insists that the plaintiff cannot recover, because his employes were guilty of contributory negligence; and it must be admitted that this question is not free from doubt, for the reason that when a person approaches a known railroad crossing in the day time, and there are no complicating circumstances, it is difficult to see why, with a fair degree of diligence, he cannot avoid a collision with a train passing along the railroad.   Counsel for the defendant insist that it

is the duty of such person to both look and listen, and, if neces-sary, he should stop his team to listen for a train. He cites *Pence v. Chicago, R. I. & P. R'y Co.*, 63 Iowa, 746, and *Rhiener v. Chicago, St. P. M. & O. R'y Co.*, (Minn.,) 30 N. W. Rep., 548; and many other cases announcing the same doctrine could be cited. It is, without doubt, true, that ordin-arily a person approaching a railroad crossing should both look and listen, and, if necessary, stop his team, and listen for an approaching train; but to this rule there are exceptions (*Funston v. Chicago, R. I. & P. R'y Co.*, 61 Iowa, 452, and the cases there cited.)

The question to be determined is whether, under the facts above stated, the employes of the plaintiff were, as a matter of law, guilty of contributory negligence. In discussing this question, it must be conceded that such employes looked for a train at the Rock Island crossing, and failed to see it, and that they did not stop and listen at any time. It must also be conceded that it required fifteen seconds to pass from there to the place of the accident, which they did not approach recklessly, but in a proper and careful manner. It must also be conceded that when the horses' heads came within view of the engineer the train was about 200 feet distant, and it was nearer than that when the wagon had so far progressed in the direction of the crossing as to permit persons in charge of the team to see the train. It does not appear how long the train was, but, as the persons in charge of the team could not see it at the Rock Island crossing, it is probably true that the view of the train was cut off by the "Cutlery," or that it was not then within sight. At the speed at which the train was running, it would require about eight seconds for it to get to the point where it could be seen when the cut-lery works had been passed, if it was behind the "Cutlery" when the team was at the Rock Island crossing, and about three seconds from there to the crossing. The persons in charge of the team saw the train when they had passed such works, but it was then too late to avoid the accident. It is

not certain that they looked in the direction the train was coming at the precise instant they passed the works, but, because of the brief period of time that intervened, it must have been very soon thereafter. Now, it seems to us it was for the jury to say whether, in view of all the circumstances, the persons in charge of the team acted as a reasonable, careful and prudent person would have done under the circumstances.                                        AFFIRMED.