LUELLA J. BROOKE, Administratrix, Appellee, v. THE
CHICAGO, ROCK ISLAND & PACIFIC RAILWAY
COMPANY, Appellant.

1. **Railroads**: CONSTRUCTION OF SWITCH : NEGLIGENCE : PERSONAL
INJURY. In an action to recover damages for personal injury to
plaintiff's intestate, while employed as a brakeman on defendant's
railroad, based upon the negligence of defendant in maintaining a
"split switch" in a defective condition, whereby the defendant's
foot was caught between the rails while coupling, and he was
thrown down and injured, the jury found specially that the
defendant was not negligent in maintaining such a switch at the
point in question, but that the switch was not constructed as such
switches generally are, and that it was out of repair, the rails
being too far apart, and returned a general verdict for the plaintiff.
The evidence showed that at the point of the switch the rails could
be set within two and one-half inches of each other or less, and
the danger complained of be avoided, whereas the rails of the
switch in question were about three and three-fourths inches apart,
and were likely to catch the foot and hold it fast. *Held*, that the
evidence warranted the jury in finding that plaintiff's intestate
was injured through the negligence of the defendant.

2. ——— : ——— : ——— : EVIDENCE. After the testimony of defend-
ant's station agent, where the accident occurred, that he had held
such position prior to the time of the accident and up to the time
of the trial, and did not know of any change in the switch in
question having been made, one of the plaintiff's attorneys was
permitted to testify as to the result of his measurements of the dis-
tances between the rails at the switch, fourteen months after the
accident, and of experiments made by him in placing his foot
between the rails, and showing where the foot could be caught
and where not, the shoe worn by defendant being before the jury
at the time. *Held*, that the evidence was competent.

3. ——— : ——— : ——— : ———. There was no direct evidence
that the foot of the deceased was caught in the switch, and was
the cause of his fall, but his shoe worn at the time was introduced
in evidence, and presented a wrenched appearance. *Held*, that
this evidence, considered in connection with the circumstances
under which the accident occurred, was sufficient to support a
finding that the deceased fell through having his foot so caught.

4. ——— : ——— : ——— : INSTRUCTIONS TO JURY. An instruction to
the jury that they should " determine whether or not the switch
was properly constructed ; that is to say, whether it was in per-
fect order or repair ;" that " the defendant was bound to exercise

ordinary care in keeping the switch in a reasonably safe condition, having regard to the safety of its employes." *held*, not objectionable as fixing, as a matter of law, the degree of order or repair that such a switch should be kept in to be reasonably safe for the use intended.

5. ———: ———: ———: ———. The plaintiff's petition charged defendant with negligence in rapidly running its cars over the deceased "after it was known by those in charge of the train that he was injured, *and* in a dangerous situation." The court instructed the jury that they would be warranted in finding the defendant negligent if they found that its cars were run over the deceased after those in charge knew that " either the said Brooke was injured *or* was in a dangerous situation." *Held*, that the instruction was proper, and that it was supported by evidence that after the engineer saw the lamp carried by deceased go over his head, and supposed he had fallen, and that there was trouble, the engine went over the deceased twice, and a stock car once. Whether the fatal result was caused by the first or second movement of the train, *held*, immaterial.

6. ———: ———: ———: PRACTICE IN SUPREME COURT. Where the correctness of appellant's abstract is denied by an additional abstract filed by appellee, and an amended abstract subsequently filed by the appellant makes no denial of appellee's abstract, the supreme court will not look to the transcript to determine the matter, but will accept the statement of appellee's abstract as true.

7. ———: ———: ———: WAIVER: INSTRUCTION. The plaintiff charged defendant with various acts of negligence, which defendant alleged had been waived by the deceased. No evidence of plaintiff's allegations was introduced, and the court in its instructions withdrew the same from the jury. *Held*, that under the circumstances the question of waiver was properly withheld from the jury.

*Appeal from Jasper District Court.*—HON. D. RYAN, Judge.

WEDNESDAY, OCTOBER 29, 1890.

ACTION for personal injury. There was a judgment for plaintiff, from which the defendant appealed.

*T. S. Wright* and *Winslow & Varnum*, for appellant.

*Philips & Day* and *Kerr & McElroy*, for appellee.

GRANGER, J.—Plaintiff's intestate, O. H. Brooke, was a brakeman in the employ of the defendant. On the seventh of December, 1887, at Colfax, in this state, while in the discharge of his duties, he was injured by defendant's train, and soon after died, as a result of such injuries. The train, on which Brooke was a brakeman about dark, pulled into the station at Colfax. The train was cut, and the engine and five cars pulled to the west, for the purpose of placing four of the cars on a sidetrack. The fireman was in charge of the engine, and Brooke and one Wilson were brakemen on the train, and were on the part that went forward. There were two switches on the main line, known in the record as the "east" and the "west" switch. The course of the train that night was west, and, to set the cars out on the north sidetrack, the east switch was to be used, and Brooke, being the front brakeman, was to, and did, open the switch, and the four cars were "kicked" in onto the sidetrack. To do this, the detached part of the train moved west until the rear car had cleared the east switch which Brooke opened, and signaled the fireman (Robinson) to back, which was done, and Brooke advanced west to a point near the west switch, and while the train was moving backward, and onto the sidetrack, he stepped between the first and second cars from the engine, and pulled the coupling-pin, which detached the four cars designed for the side-track. The signals given by Brooke were with his lamp, and, after pulling the pin, the fireman observed his lamp go over his head, and, taking it for granted he had fallen, he stopped the train,—that is, the engine and one car,—and Brooke was found lying with his head to the north, and both limbs crushed, one at the ankle, and the other midway between the ankle and knee. The specific grounds of negligence of which the plaintiff complains on this trial are: *First*, the construction and condition of the west switch where the injury occurred; and, *second*, the operation of the train in such manner that the engine and car or some part of it

passed over Brooke after he fell, and his situation as to danger was or should have been known.

I. The switch in question is what is known as a "split switch," and as to such switch, and the place of the injury, the jury made the following special findings in answer to the questions submitted: "Q. 11. How far east of the west switch was the deceased when he was injured? A. About eight feet.

1. RAILROADS: construction of switch: negligence: personal injury.

"Q. 15. Was it negligence on the part of the defendant to use a split switch near the place where the plaintiff's intestate was injured? A. No.

"Q. 24. Was the switch at and near the place where the accident occurred constructed as such switches are usually constructed? A. No.

"Q. 25. Was this switch out of repair? If so, in what respect? A. Yes; too much space between the split rail and the stationary rail."

We proceed then with the fact established that there was no negligence in the kind of switch used. The negligence then with which we have to do, if any, is in the construction of the switch, and the condition it was in at the time of the injury, and, at the outset, we should be careful to avoid any misapprehension as to the terms used; and it has seemed to us that, in argument, the word "construction" has not been understood in the sense intended by the finding of the jury. The theory upon which it is claimed that the injury resulted from the switch is that after the pin was pulled by Brooke, in his attempt to pass out from the train, his foot caught between what is called the "split rail" and the stationary rail, and so held him that he fell, and his legs were crushed by the moving train. Now, our understanding of the finding of the jury is that a split switch, when properly adjusted or placed, is a reasonably safe one, but that the one in question was not so placed or adjusted. A description of the switch may aid us somewhat to know if the jury, under the evidence, could properly so find; for a position of appellant is that the record is a conclusive showing against negligence in

the construction of the switch. One Howard North was an employe in the office of defendant's road-master, and being familiar with such switches, and the one in question, gives a description; and we will use his description as given in his testimony. It may be well to first say that a split switch is made by the use of two split rails between the stationary rails that make the track, the split rails being chamfered off on the side of each, next to the stationary rail, these split rails being held in position by iron cross-bars fastened to the flange or base of the rails, so that, by one movement of the switch rod, both rails were moved, and the switch opened or shut as may be desired. One of the switch rails must at all times constitute a part of an open track; the other being a part of a track not open for use. The heel of the switch or switch rail is the end made stationary, and connected with the line of other rails which constitute the track. The point of the switch or switch rail is the chamfered end, and movable by the switch rod. The point of the switch in question is to the west; and we now look to the description given by Mr. North:

"About five feet from the west end of the switch rail, it commences to be lessened, and is diminished in size until it reaches a sharp or thin point at the west end, and if so pressed down or lessened as that, when it is thrown back against the stationary rail, it closes tight to it. The switch rail has a hollow cut in it, on the side next to the stationary rail, so that the ball of the main rail will fit into the hollow. When the switch is thrown back against the rail, it stands with a feather edge, and for a distance of about five feet, when it assumes the shape of the rail. The ball of the switch rail is cut down so that it does not bear any weight of the train at first and then, as it gets along about five feet from the west end of the rail, it takes the whole weight of the train,— probably before that. It rises a little above the opposite rail, just enough to bear the weight of the train, and this carries it off onto the switch. When the switch is thrown off from the main track, the point of the switch will be a little less than six inches south of the stationary

rail.  *  *  *  If the switch were thrown open so as to
let the train pass upon the main track, the switch rail
and the main rail would be about two inches and three-
quarters apart at the nearest point in the middle, or near
the middle, of that switch, at the nearest point of juxta-
position, assuming that they were five inches apart at
the ends. It would extend as far back as they could put
it in,—wherever there is any danger of the foot getting
in, and just as far back as they could, without making
it meet one another, so that the rails would come
together when the switch is thrown up. There is no
blocking at the other end,—the point of the switch rail.
*There could not be.* The blocking would extend back
six or eight feet, *ranging according to the curve of the
switch.* If you had a curve that would bring your frog
within thirty-two feet of the switch, then the block
would have to go a good deal further back ; the hinge of
the switch would be further from the stationary rail."

The element of danger in these switches is the V
shape, caused by the convergence of the split rail and
stationary rail, and in such proximity that a person's
foot may become wedged between them ; and this is
appellee's theory of how Brooke was injured. It is
conceded that, at the point where the injury occurred
in this case, the danger could not be avoided by block-
ing, as is done at other parts of the switch. The theory
upon which the danger is said to be avoidable is by
placing the split rail and the stationary rail so near
together or so far apart as not to admit of the foot
being caught. The jury in this case has found that the
space between the rails was too much, and the testi-
mony quite clearly shows that near where Brooke fell a
man's boot could be caught between the rails. It
clearly appears, by experiment, that, from about five to
six feet east of the point of the switch, a person's foot
would become fast, and that, seven and one-half feet
from the point, it could not be removed. It should be
in mind that, when the accident occurred, the switch
was set for the main track, and that the switch rail on
the north side (where Brooke was) was not against the

main rail, but away from it; and the testimony shows that the point of the switch rail was five or six inches from the main rail, and that. the distance gradually decreased to a point seven and one-half feet east, where the distance was about three and three-fourth inches. At that point the foot became fast, but it was by putting the foot between the rails, where the space was wider, and sliding it forward under what is called the "ball of the rail." It would then seem that if these rails, at the point where the foot would enter, had been no more than three to three and one-half inches apart, the danger would, at least to some extent, have been avoided. Now, could the switch have been so constructed, consistent with its proper use, or could the rails have been enough further apart to have avoided the danger of persons being thus caught? The record is such as to satisfy us that, other than at the point of the switch, the rails could be within two and one-half inches, or less, consistent with the operation of the train. In fact, the testimony of North, based on the theory of the. distance at that point being five inches, fixes the distance seven and one-half feet east of the point at two and three-fourth inches, and in this respect he differs from the witness Kerr as to such distance some three-fourths of an inch or more. We must, of course, assume that state of facts having support in the testimony, consistent with the finding of the jury. If the space at the point of the rail should be five inches, of course, for the five or six feet in which the rail is chamfered, the space must lessen gradually, but the distance must be comparatively short till the space would be too narrow to admit the foot. We are not to fix the distance apart that such rails should be to constitute due care, and we only inquire if the record is such that the fact of negligence could legally be found. It is of course obvious that with the switch rail closed up, and its point in contact with the main rail, and the two gradually diverging, there must be a point where a foot might be thus caught; but it would seem that by widening or narrowing the space between the split rail and

the main rail, when not in contact, the situation might be so as to avoid such danger. If that could be, and had been, Brooke could not have been injured as appellee claims, and as the jury must have found he was. Nothing in the record or in argument enables us to say, as a matter of law, that the jury could not have found that the construction of the switch was defective. Conceding that some such place of danger must be, if trains are to be operated, it is reasonable to say the number should be reduced as much as practicable, and where it can be done, and is not, the question of whether or not the failure amounts to negligence is generally one of fact for the jury.

II. Objections are made to the testimony of Mr. Kerr for the plaintiff. He is one of the attorneys for

2. ——: ——;
——: evidence.

plaintiff, and is the witness who made the measurements at different points. The objection to the testimony is that the measurements were made nearly fourteen months after the accident, without proof that the conditions were the same. One J. M. Stamer was a witness for plaintiff, and testified that he had been the station agent for defendant at Colfax for fourteen or fifteen years, and up to the time of giving his testimony, and that he knew of no change having been made. It is true, we think, that a change in the switch might have been made, and he not know of it, but considering his relation to the road at that point, and the fact that he had no knowledge of a change, with the silence of defendant in that respect, we think it was not error for the court to admit the testimony of Kerr. The facts as to any change being so clearly within the knowledge of the defendant, and after such testimony by its agent in charge of the station at that point, if there had been a change, we think the defendant should not have remained passive, but have shown the fact. Such a rule is in the interest of a safe and proper disposition of causes.

It is also urged that the testimony of Kerr, as to the experiments in placing his foot between the rails, showing where the foot would be caught, and where not,

was erroneously admitted. We regard it as clearly competent. A very important fact to be known was whether, with the situation of the rails, a foot could or would be likely to be caught. We can hardly imagine testimony that would better show the fact than such experiments. The shoe that Brooke wore was before the jury, and the witness who made the experiment was there, and the relative size of the shoes worn by each could be known. The case of *Klanowski v. Grand Trunk Ry. Co.*, 31 N. W. Rep. 275, is cited as authority against the admission of such evidence. The force of the holding in that case is much lessened, because of a divided court, and then the facts are so dissimilar that, if an unquestioned rule, it would not be controlling No case to which we are cited is authority against the action of the district court in admitting the testimony.

III. It is said there is no testimony to support a finding that Brooke caught his foot between the rails and fell, any more than there is that he stumbled over the rails in passing out from between the cars. It is true there is no direct testimony to show the fact. No one saw his foot between the rails, and he was the only person to know the facts. But, in legal proceedings, such facts are found from surrounding circumstances. It is true that Brooke fell and was injured near the point where the condition of the switch was such that a foot might be caught. The shoe worn by Brooke was in evidence, and was before us, and bore some indications of the foot having been caught. The shoe presented a wrenched appearance. The train being in motion, he must have moved with it along the track, and in the direction for his foot to become wedged in or caught. We do not regard it as conclusive that the foot could not have been caught, because it was not so when he was first found. It is easy to understand that the foot might have been released by falling, or by the wheels passing over the limbs. Much in this respect would depend upon how firmly the foot was caught or wedged between the rails.

3. THE same.

From our examination of the record, we incline more to
the view that the injury resulted from the foot being
caught, than by merely stumbling over the rails.   We·
think it would be difficult for a disinterested person to
read the record without such a conviction   It was, how-
ever, to our minds clearly a question of fact for the·
jury, and upon evidence sufficient to sustain the find-
ing.

IV.   The seventh  instruction is as follows :   "If
you find from the evidence that defendant is not guilty
of negligence in selecting the class of switch
4. —: —: which in this case has been  denominated.
—: instruc-
tions to jury. the ' split switch,' but was in the exercise
of ordinary care in selecting such switch, then you may·
further pursue the inquiry, and determine whether or·
not the switch was properly constructed ; that is to say,
whether it was in perfect order or repair.   The defend-·
ant was bound to exercise ordinary care in keeping the
switch in a reasonably safe condition, having regard to·
the safety of its employes engaged in performing their·
duties for the defendant.   It does not follow, because·
of the fact that the switch, at the time of the alleged
injury, was out of repair, if such is the fact proved,
that the defendant was guilty of negligence.   The rule·
is, if the switch and guard rails were properly con-
structed originally, and by use or otherwise were out
of repair, then the defendant would not be liable unless·
it appeared that it had knowledge of such defects, or·
that such a length of time had elapsed after such defect·
that, by the exercise of ordinary care and prudence, it.
would be presumed to know of such defect.   If, how-
ever, in its original construction, the switch was not:
properly constructed, or if the guard rails were not·
properly constructed,—if it appear that this defective
construction caused the injury,—then no lapse of time·
to bring this defect to the defendant's knowledge is.
required."   The complaint is that the instruction per-
mits the jury to inquire ·whether or not the switch was.
in *perfect order or repair*.   Just the degree of order or·

repair that such a switch should be kept in to be reason-ably safe for the use intended is not fixed as a matter of law, and, if the jury had been told that the company was required to keep the switch in perfect order or repair, it would have been error, because the effect would have been to determine that perfect order or repair would be essential to a reasonably safe condition; but the jury is not so told, and, when the instruction is fairly considered, there is little room to doubt the meaning of the court. The tenor of the instructions throughout, barring the particular words referred to, convey the idea of only reasonable care and safety as the rule. The objectionable language is immediately followed by these words: "The defendant was bound to exercise ordinary care in keeping the switch in a reasonably safe condition, having regard to the safety of its employes engaged in the performance of their duties." A reasonably safe condition might require "perfect order or repair," or something less, and on the whole, while the jury is told that it may inquire whether or not the switch was in perfect order or repair, it is not told that such a degree is essential, but is told, in quite specific language, the degree of order or repair in which it must be kept by defendant to avoid liability, and is so told in immediate connection with the words complained of. The court in the instruction seems to have distinguished between or called attention of the jury to two acts as to which there might be negligence: *First*, selecting the kind or class of switch, and, *second*, the construction; and the latter embraces the putting or having it in proper order or repair. The jury find for defendant as to the selec-tion, and for the plaintiff as to the order or repair, by say-ing that it was not constructed as such switches usually are, because of too much space between the rails. When the findings and the instructions are both con-sidered, there is little room to doubt that the instruc-tion was properly understood.

V. The petition in charging the acts of negligence by defendant used this language: "And said defendant

**5. THE same.** was further guilty of negligence in operating its trains at a rapid rate of speed, while plaintiff was required and commanded to make the coupling of its cars in its train, and in running its cars over said Oliver H. Brooke, after it was known by those in charge of the train that he was injured, and in a dangerous situation." The court in its eighth instruction told the jury: "If you find from the evidence that the engineer in charge of the train, after he knew that either the said Brooke was injured or was in a dangerous situation, moved the cars so that they ran over the deceased, and that, by the exercise of ordinary care or prudence, he could have avoided so running over him, then this would amount to negligence on the part of defendant." It will be observed that the instruction holds to a rule for negligently running over Brooke after knowing he was injured *or* in danger, while the averment is that the negligent act was done after knowing he was injured *and* in danger. The rule given by the court is right. The legal gist of the averment is that, after the parties in charge knew that the situation of Brooke was such that the train should be stopped, they negligently ran over him, and such construction was the necessary guide to the introduction of evidence. The intention of the pleader was too manifest to be misleading to the defendant. The rule that words, mere surplusage, should be disregarded, and need not be proved, is extended even to criminal pleadings and procedure.

It is urged that there is no evidence of a failure to exercise due care to stop. There certainly is evidence showing that, after the engineer saw the lamp go over Brooke's head, he supposed he had fallen; that there was trouble, and that he should stop. It is also quite apparent that the engine passed over Brooke twice, and the stock-car once. There is evidence from which it might be found that the engine passed over him the second time, because the power was put on for the engine to go forward after it had passed over him going

backward. Certainly there is evidence to justify the instruction.

It is also said : "There is no evidence that, by any movement of the cars after the deceased was injured, the fatal result was caused." This action is to recover for the injuries resulting in death, whether by negligence in one or both particulars. That he was killed by the operation of the train admits of no doubt. The jury must have found that death resulted from a negligent act. If the first passage of the train was fatal, and appellant says there is no evidence that it was not, then it is entirely immaterial as to the other. If not, then death resulted from the latter. The evidence as to the knowledge of injury or danger was before the train had passed either way. There is evidence upon which to predicate negligence in killing Brooke by the passage of the train over him either way, and we thus meet the query whether, before plaintiff is entitled to a submission of her cause as to negligence in passing over Brooke the second time, there must be evidence showing the effect of passing over him the first time. The claim for such a rule is not supported by authority, and is not in harmony with our practice. If the death was the result of negligence, it is not a matter of vital importance that the particular act should be known. If defendant desired to know the particular fact upon which the verdict was based, with a view to overcome presumptions in favor of the verdict, its recourse was to special findings.

VI. Appellant presents several pages of an abstract purporting to be copied from a railroad gazette, and

6. ——: ——: ——: practice in supreme court.

urges that it was improperly admitted in evidence. Appellee files an additional abstract, denying that the article was ever offered, or in any manner used, in evidence. Appellant files an amendment to its abstract, but makes no denial of appellee's abstract; hence, we take the statement in appellee's abstract as correct. Appellant claims that the transcript sustains its position, but we do not go to the transcript unless appellee's abstract is denied.

*White v. Savery,* 49 Iowa, 197 ; *Kearney v. Ferguson,* 50 Iowa, 72.

VII. Plaintiff pleaded certain other acts of negligence by the defendant, as that the cars were not provided with proper handholds, couplingpins, etc., and that the train was operated at too high a rate of speed. Defendant, in its answer, pleaded a waiver of these defects by plaintiff's intestate. The court in its instruction told the jury that these allegations by plaintiff had no evidence to sustain them, and withdrew them from its consideration. Appellant insists that it was error not to submit the question as to waiver. Appellant cites some authorities bearing on questions of waiver when properly in issue, but none applicable to such a state of facts ; nor does counsel assume to argue the effects of the court's action. Comment is unnecessary.

*7.* ——: ——:
——: waiver:
instruction.

There are no other questions important to be considered, and the judgment below is AFFIRMED. [1]