CHRISTINA BURG, Administratrix, Appellant, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.

**Railways: Duty to Trespasser: YOUNG CHILD.** While an engineer is not bound to stop his train whenever he sees a human being on the track, unless he has reason to believe that it will not leave the track, and much less so if he has doubt as to what the object seen is, yet he is bound to assume, when he sees small children on the track, that they will remain, and he is at once charged with the highest degree of care on their behalf. (7)

**License to Use Track.** The mere fact that persons, for years, with defendant's knowledge, use the track, does not establish that the use of the same was licensed by defendant. (2)

Rule to look out: application of. A rule that crews on extra and delayed trains should keep "a sharp lookout for section men and others who may be obstructing the track," does not apply to trespassers. (3)

Ex parte test: competency in evidence. On the question whether the train could have been stopped after deceased could have been seen by the engineer, evidence of tests made by defendant under similar circumstances, is admissible, though plaintiff was not present at the tests. (5)

Books of Science. An extract from a treatise on the distance requisite to stop trains, which does not give the size of the train, the pressure applied to the brakes nor the character of the grade, is not admissible under Code, section 3653. (4)

Same: "railway age." While the "Railway Age" contains articles of historical value and others pertaining to science and art, it is not such a work of history or book of science and art as Code, 3653, contemplates. (4)

Same: disparagement by court. It is not error for the court to disparage the probative value of a work which should not have been admitted at all. (4)

Ordinance: Reasonableness: speed of trains. A train running at a speed greater than allowed by an ordinance of the city of Des Moines killed a child at a point which was not within the city when the ordinance was passed, on both sides of which point, for a long distance, no platted streets were open across the track, and where the right of way was fenced on both sides. *Held*, that as to the place of the killing, the ordinance was unreasonable and void. (1)

*Appeal from Polk District Court.*—Hon. C. P. Holmes, Judge.

Wednesday, January 31, 1894.

The plaintiff is the administratrix of the estate of Peter Burg, Jr. Peter Burg, Jr., was a child three years of age, in October, 1890, living with his parents near the line of defendant's road within the city limits of Des Moines, some three miles west from the passenger depot in the city. On the eleventh day of October, 1890, Peter Burg, Jr., with his sister, a child about nineteen months old, left the home of their parents, some one hundred and sixty-three feet south of defendant's track, went upon the track, and sat

down between the rails, and while playing there they were struck by defendant's train, and killed. This action is to recover damage because of the death of Peter Burg, Jr. In the district court there was a judgment for the defendant, and the plaintiff appealed. *Affirmed.*

*Cole, McVey & Cheshire* for appellant.

*Cummins & Wright* and *Geo. E. McCaughan* for appellee.

GRANGER, C. J.—I. In the city of Des Moines is an ordinance limiting the rate of speed of trains to six miles an hour. Plaintiff offered in evidence the ordinance. It was excluded under an objection that it was "incompetent, immaterial, and for the reason that the evidence already shows that the place where the accident happened was so far removed from a crossing as to render the ordinance unreasonable, even if it was in force." When the ordinance was adopted, the place where the accident happened was not in the city of Des Moines, the city having been since, by an act of the legislature, enlarged so as to embrace that place, with other territory. It will appear from this fact that the ordinance was not adopted as being, in the judgment of the council, a reasonable regulation for the operation of trains at the point in controversy. It is not to be understood that the ordinances of the city do not apply to it as enlarged; but, in determining the question whether or not the ordinance is so unreasonable as to be of no validity at the point in question, importance may be given to the fact of whether or not the act, at the time of its passage, was designed or intended as having force there, for, if not, the legislative sanction comes from the fact that the ordinance stands unrepealed after the territorial change in the city, rather than from legislative action based upon known

conditions. How far such a fact should, or might, properly influence a judicial determination of the question of the unreasonableness of an ordinance, as bearing on its validity, is not, perhaps, to be definitely stated, nor would it likely be the same in all cases. At the place where the accident occurred, there was no greater necessity for such a limit on the speed of the train than in very many places outside the city or station limits. East of the point some two thousand, eight hundred feet are brickyards, where there is an opening for men and teams to cross the track. From this point west, some two miles beyond the place of the accident, the defendant's right of way is fenced. It is also fenced through West End addition to the city of Des Moines, which is over one thousand, two hundred feet east of the place of the accident, and in this addition the platted streets do not cross the railway track. Along where the accident happened, on both sides of the track, there are no residences, except that of Burg, it being about a fourth of a mile from any other, and the land is wooded and uncultivated on both sides of the road, except a small piece near the house of Burg. This case comes clearly within the rule and reasoning of *Meyers v. Railway Co.*, 57 Iowa, 555, 10 N. W. Rep. 896. Some importance is attached to the facts of the platted West End addition and the brickyards crossing just east of it. They are not of such importance as to change the rule. In the addition, there are but a few buildings,—seven in all,—and, as we have said, the streets, as opened, do not cross the right of way, which is fully protected by its fences. The brickyards crossing is some two thousand, eight hundred feet east of the point of the accident, and could not in any way affect the reasonableness of the rate of speed at that point. After leaving the brickyards crossing, if not before, the train had passed the conditions as to settlement and the business of the city

which demanded the limit upon train speed that is imposed by the ordinance. The city, as enlarged, is nine miles in width, requiring, under the limitations of the ordinance as to rate of speed, one hour and thirty-five minutes to make the distance, when, without any opportunity for dispute, for a part of the distance the limit is absolutely unnecessary. As is said in *Meyers v. Railway Co.*, *supra:* "The ordinance in question not only places an unreasonable restriction upon the railways themselves, but it unreasonably impedes the whole traveling public." It is, however, urged that the action of the city council is conclusive as to the validity of the ordinance.

The *Meyers case* cited involved the validity of an ordinance in the city of Council Bluffs, which city is under a special charter which does not, in express terms, grant to the council power to regulate the speed of trains, but the authority so to do is implied from other express powers granted. The city of Des Moines is incorporated under the general incorporation laws of the state, and the law, in express terms, confers authority upon cities incorporated under it to regulate the speed of trains within their limits. It is said that the power of courts to inquire as to the reasonableness of such ordinances is limited to cases in which the ordinances are adopted under an implied authority. In the *Meyers case* the authority of the court to determine the reasonableness of the ordinance is not questioned. The case, however, cites as authority the rule announced in 1 Dillon on Municipal Corporations, section 319, that: "In this country the courts have often affirmed the general incidental power of a municipal corporation to make ordinances, but have always declared that ordinances passed in virtue of the implied power must be reasonable, consonant with the general powers and purposes of the corporation, and not inconsistent with the laws or policy of the state." The citation is but a recognition

of the rule of such interference by the courts where the
action of the council is upon implied authority only.
Its only application to this case is that it does not
announce the rule as applicable to cases of express as
as well as implied authority, leaving, perhaps, the
inference that in cases of express authority a different
rule might obtain.   It is true that the rule as stated in
Dillon on Municipal Corporations, because of the spec-
ification as to implied powers, would seem to exclude
from its operation cases in which the ordinances were
adopted under express authority.   Such a rule obtains
in statutory and perhaps, to a greater or less extent, in
general legal interpretations.   Counsel for appellant
cite numerous authorities, some of which support the
rule of their contention, while others, as we view them,
do not.   No less can be said than that the authorities
are in conflict.   In the case of *Town of State Center v.
Barenstein*, 66 Iowa, 249, 23 N. W. Rep. 652, which was
a criminal prosecution for the violation of an ordinance
licensing peddlers, adopted under an express authority,
this court said:   "The power to regulate and license
peddlers is unquestioned.   It is expressly conferred by
section 463 of the Code.   But the power can be exer-
cised only under an ordinance; and if the ordinance is
passed for such purpose, and is such that the court
must, upon a mere examination of its terms, declare it
unreasonable, it is void."   The case cites, for its sup-
port, Dillon on Municipal Corporations, section 254,
which in the fourth edition is section 320, following the
one heretofore quoted from, and the two sections are
designated as "on the same subject."   It will thus be
seen that this court is committed to a broader rule than
that of appellant's contention.   As bearing on the case,
see *Gray v. Land Co.*, 26 Iowa, 387; *Williams v. Carey*,
73 Iowa, 194, 34 N. W. Rep. 813; *Hayes v. City of Ap-
pleton*, 24 Wis. 542; *Clason v. City of Milwaukee*, 30
Wis. 316.   *Evison v. Railway Co.*, 48 N. W. Rep. 6, is a

Minnesota case, and its similarity to this case is quite striking. The authority to the city council to regulate the speed of trains was expressly granted. We quote the following from the opinion. "A mere statement of these facts ought to be conclusive that, as applied to this part of defendant's road, the ordinance is so manifestly unnecessary to the protection of health and property that no two minds could reasonably differ upon the question. According to the map, which is made part of the record, the limits of the city must be about nine miles in length by seven in breadth, embracing much land that is not even platted, and hence presumably unimproved, or else devoted to purely agricultural purposes; and it is undoubtedly true that much of that which is platted on paper is in the same condition. To apply uniform, ironclad rules to the whole of this territory, that no train shall run over four miles an hour, is unnecessarily oppressive, and, if obeyed or enforced, would deprive the public of anything like reasonable suburban transportation." We think there was no error in excluding the ordinance under the objection made.

II. A demurrer was sustained to the following amendment to the petition: "That for a long period, to wit, for more than ten years, defendant's roadbed and right of way, from a point west of where the accident happened to the city of Des Moines, has been used by the public as a thoroughfare to and from said city of Des Moines, which fact was well known to the defendant and its employees; by reason of which it became the duty of the defendant and its employees to use greater diligence in looking out for persons who might be upon the track at this point, than if the defendant had not permitted such use of its tracks without objection, as it had done for said period of time." It will be seen that the first part of the amendment states facts, and the latter part conclusions therefrom. The

argument is to the effect that the amendment pleads a license on the part of the company to the public to use the track, and hence additional care on the part of the company is required. The facts stated are not such that the law would infer a license from them. The conclusion stated in the amendment, which indicates the intention of the pleader, is not the equivalent of a license. It states a legal conclusion resulting from a mere use of the track without invitation, or even consent. Such facts do not show a license, nor do they create obligations on the part of the company towards persons so using the track. We are not saying that there might not be such a use of the track as that the assent of the company might be understood or implied therefrom; but no such state of facts is pleaded. See *Richards v. Railway Co.*, 47 N. W. Rep. 63; *Masser v. Railway Co.*, 68 Iowa, 602, 27 N. W. Rep. 776. There was an offer of evidence to show such a use of the track as would amount to a license on the part of the company, which was refused. The above considerations will dispose of that question. The offer was not of particular facts, so that the court could judge of their sufficiency for that purpose, but a mere offer to prove facts that would show a license. The court could rightfully assume that the facts stated in the amendment offered were those relied on, and those were insufficient.

III. Plaintiff filed an amendment to her petition, setting out a rule of the company, as follows: "All extra trains or engines and delayed regular trains must sound the whistle on approaching curves and obscure places, where the view is not clear for at least half a mile, and keep a sharp lookout for all work trains, section men, and others who may be obstructing the track." To the amendment there was a demurrer, which the court sustained. The point of contention is as to the application of this rule to this case,—that is,

was it intended to apply to persons wrongfully on the track? We think the universal current of authority is that it has no such application. In the case of *Railway Co. v. Howard's Adm'r* (reported in 19 Am. and Eng. R. R. Cases, 98) in determining the admissibility of such a rule in evidence, it is said: "Rules and regulations adopted by the company for the preservation of its passengers and trains do not apply to trespassers on its road whose own wrongful and negligent conduct places them in danger; and the only obligation or duty on the part of the company or its employees in such a case is, when made aware of the danger, to avoid inflicting any injury if, by the exercise of ordinary diligence, they could prevent it." It is hardly to be doubted that the company had in view, in promulgating the rule, only such obstructions to the track as might arise from the conduct and management of the road, and not obstructions not in reason to be anticipated. See *Harty v. Railway Co.*, 42 N. Y. 468; *Railway Co. v. Spearen*, 47 Pa. St. 300.

IV. The American Mechanical Dictionary was, by the testimony of the state librarian, shown to be a standard scientific authority on the subjects treated therein. An extract therefrom was offered in evidence, treating of the mechanical appliances for stopping trains and the distance required therefor, and, against objections, admitted; but the court took occasion to comment on the value of the extract as evidence, saying that it was "not very satisfactory evidence;" stating that it did not give the size of the train, the pressure applied to the brakes, the character of the grade,—in short, that it did not appear what the conditions were under which the trains were stopped. The court admitted the extract under the rule of the statute providing that historical books, books of science or art, etc., when made by persons indifferent between the parties, are presumptive evidence of facts of general

notoriety or interest. Code, section 3653. Whether or not the distance in which a train may be stopped under given conditions is a fact of such general notoriety or interest that such evidence would be competent we need not consider, for we think the reasons given by the court why the evidence was not very satisfactory were reasons why it should have been excluded. The negligence of the defendant was not claimed to be in the equipment of its train, so that no question arises as to that fact. The entire absence of facts showing the conditions under which the trains spoken of in the extract were stopped, rendered the extract of no avail whatever in determining the fact of negligence in stopping the train in question. The facts disclosed were not such as could give to the extract the force of presumptive evidence as contemplated by law. If it should not have been admitted, the remarks of the court in disparagement of its value could not have been prejudicial.

V. The plaintiff offered in evidence a record of tests made between the Westinghouse brake and Evans driver brakes, and also one of the tests made at twelve principal cities of the United States, giving results of the Westinghouse brake. These records were contained in the *Railway Age*. The offer was made under the provisions of Code, section 3653. The basis of the offer was the testimony of one Webster, who is a locomotive engineer. He said he was acquainted with the publication; that it was "recognized among railway men as a standard authority on railway matters; as a scientific journal on matters of which it treats,—railways and their appliances." His further testimony shows that the paper is devoted to the advertisement of numerous mechanical devices that are patented from time to time, that it gives puffs in reference to various contrivances that are used in mechanics, and that it contains recommendations of various mechan-

ical devices. The witness said: "I would not want to swear to it any more than I would to the *Iowa State Register*. It sustains the same relation to railroads as the local paper does in local matters. It contains editorials on different subjects. It gives the opinion of the author upon this and that subject." The publication is not an historical work, nor a book of science or art. It undoubtedly contains articles of historical value, as well as those pertaining to science and art. This is true of very many leading periodicals of the country that do not come within the purpose of the statute giving to works of history and books of science and art a value in judicial proceedings which is the equivalent of a legal presumption. The court properly excluded the publication.

VI. Two very important questions in the case are these: *First*, the distance at which the children could first be seen by the engineer of the approaching train; and, *second*, the possibility of stopping the train, so as to prevent the accident, after the situation was, or should have been, known. Before reaching the point of the accident, there is a curve in defendant's road, and it is when coming out of or around this curve that the point can first be seen. As to the distance at which the point can be so seen, the parties are in dispute; the plaintiff claiming that the engineer saw the children a distance of seven hundred and forty-three and two tenths feet, and the defendant that they could not be seen at a greater distance than from five hundred to five hundred and fifty feet. The engineer admits that he saw the children at a distance of from four hundred to four hundred and seventy-five feet. The accident occurred in October, 1890. In January, 1891, and again in May, 1891, the defendant made certain tests with trains to ascertain the distance at which the children could have been seen, and also the distance required to stop the train when running at the same

rate of speed as the train did on the day of the accident. The tests made in May were with the same train in use when the accident happened. Those in January were made with a train claimed to be substantially like the other. These tests were made without notice to the plaintiff. The court admitted proofs of these tests against the objections of the plaintiff. It is urged that the conditions were so dissimilar as to render the tests incompetent. It is true that they were not identically the same, but they were essentially so. It was at the same place, on the same track; in one case with the same train, and in the other with one so like it that it is not to be seen that it would not furnish a test sufficiently correct to be an aid in determining the fact to be found in the case. It is urged that the accident occurred about noon, and that the January test was made in the afternoon, when the sun would prevent seeing an object on the track. That does not appear to have been true in fact. So far as the record discloses, the opportunity for seeing at the different times was equally good. In fact, we do not discover a difference as to conditions in any substantial particular. We think these tests were proper, and, if fairly made, the facts thereby disclosed would be of great value in reaching a conclusion. We can not adopt appellant's view that it was an attempt to "manufacture *ex parte* testimony." Instances are without number where, pending litigation, the parties have made test measurements and trials relating to facts in dispute, and they have been regarded as competent, and a quite satisfactory class of evidence upon questions of fact, and we are not favored with a suggestion against the reason of such a rule. Upon the question of admissibility of such evidence, courts have never assumed that it was "manufactured," in the sense in which the term is used in argument, and for that reason excluded it, even where the acts are those of the parties. Parties are made competent wit-

nesses, and their testimony is admitted with the same legal presumptions as that of other witnesses; but, in weighing the evidence, all facts, including interest, that might reasonably affect its value, are to be considered. It is not the law that in making such tests, measurements, etc., the opposite party is entitled to notice in order that he may be present. It is the right of each party, in the preparation for trial, to take all legal steps in the way of being able to meet the issues of fact by proofs; and in preparing for the presentation of his evidence no notice to the adverse party is required. It is not for us to say, because this is a corporation owning the road and means for making the tests, that it is exempted from the general rule,—that is, that it shall not use these means with a view to demonstrating the truth. When they are used, the circumstances of their use, including motives for, and all indications of, an unfair or impartial use, are matters that may lessen the value of the testimony. The case of *Klanowski v. Railway Co.*, 31 N. W. Rep. (Mich.) 275, is relied upon by appellant. It is not a case of authoritative force, because of a division of the court; it appearing that but two of the four judges sitting concurred upon the particular point cited. We are referred to the case of *Brooke v. Railway Co.*, 81 Iowa, 504, 47 N. W. Rep. 74, upon a question of experimental evidence wherein the plaintiff made the test, sustaining the right to do so. In *Nosler v. Railway Co.*, 73 Iowa, 268, 34 N. W. Rep. 850, the same rule was held in favor of the plaintiff against the company, and under circumstances equally doubtful as to a similarity of facts. We think the following statement in *Railway Co. v. Mugg*, 31 N. E. Rep. (Ind. Sup.) 564, is quite to the point: "Under some circumstances this class of testimony may be very satisfactory, but, unless the experiments are shown to have been made under essentially the same conditions, the tendency is to confuse and mislead, rather than enlighten, the jury." While

the conditions need not be identically the same, they should be essentially so; and the important fact to have in view in passing upon the admissibility of such testimony is, will it aid, rather than confuse, the jury in reaching its conclusions. With that as the rule, we think the testimony in this case was properly admitted. It may be added that the court, in a very appropriate instruction, guarded against ill effects from the evidence because of varying conditions.

VII. The following instructions given by the court are made a ground of complaint in a single branch of the argument: "5. You are instructed that when and after the engineer saw the object upon the track, and discovered that the object seen was the deceased, it became his duty to use all the care and diligence that an ordinarily prudent and careful person would have used, under the circumstances in which he was then placed, to stop said train in time to save the life of said Peter Burg, Jr.; and, if you shall find that he did use such care and diligence in trying to stop said train, there was no negligence in stopping said train for which the defendant can be held liable." The next instruction (sixth) states the opposite of the rule, to the effect that if he failed to use such care and diligence he would be negligent, and the defendant liable. The following is the seventh instruction: "If you shall find from the evidence that the engineer, when he first saw the deceased upon the track, honestly thought it was an inanimate object, or was in honest doubt whether the object seen was a human being, then and in that case you are instructed that it did not become his duty to thereupon stop his train; that such duty only arose when he discovered that the object seen by him was a human being, in such a position as gave the engineer no reason to expect that the person would remove from the position of danger he was then in." It will be well, in this connection, to state the rule as to the diligence

required of the engineer to know of the presence of the
children on the track. The children were, in a legal
sense, trespassers. They went upon the track, and sat
down to play. The engineer was not bound to exercise
any care with reference to such persons, and was under
no obligation to act for their safety until they were
actually discovered. *Masser v. Railway Co.*, 68 Iowa,
602, 27 N. W. Rep. 776, was for the killing of a boy
eleven years old, who, with another, had gone upon the
track, and was "playing or lounging there." It is said
in the opinion by Chief Justice Adams: "But the
plaintiff contends that the boy might, and should, have
been seen sooner. It seems not improbable that he
might have been seen a little sooner, but no locomotive
engineer is bound to watch out for trespassers on the
track. The company does not owe trespassers that kind
of care. This has been settled by repeated adjudica-
tions." The case cites a number of authorities on
the question, and the rule is an undoubted one. The
settled rule being that the duties of the engineer with
reference to saving the lives of the children commenced
when he actually knew of their presence on the track,
we may inquire as to the correctness of the rule stated
in the instructions. It is said that the instruction "told
the jury that those in charge of the train were only
required to use ordinary diligence in trying to stop the
train, and save the lives of the children, after they saw
the children, and knew they were human beings." As
we interpret the statement in argument, it does not
state the rule of the instruction. The rule of the in-
struction is that when the child was discovered (and
this, under the law, was when the engineer became
charged with diligence) he must use all the care and
diligence that an ordinarily careful and prudent man
would have used, under the circumstances in which he
was then placed, to stop the train. What is the care
and diligence that a reasonably careful and prudent man

would have used under such circumstances? Not a mere ordinary effort to stop the train, but the use of every means at his command—an exercise of the highest degree of care and diligence. Such an effort or exercise of care would be the natural promptings of an ordinarily prudent man under such circumstances. The law requires, at all times, that persons should act with reasonable care and diligence; but what acts will constitute reasonable care and diligence depends upon the circumstances in different cases, and, as circumstances vary, so will requirements as to reasonable care and diligence. In another instruction the court explained the rule, so that its proper application by the jury is not doubtful. The complaint as to the seventh instruction is that under it "the engineer might have believed the objects he saw were children, but yet entertained some doubts that they were," and that the jury was told that "the engineer was under no obligation to stop the train until he knew they were children." The gist of the instruction is that the engineer was not required to stop his train until he knew that the object on the track was a human being, and then only when he had reason to believe it would not leave the track. The phrase as to an honest doubt does not change its effect. It is not the law that, when a human being is discovered on the track, an engineer must stop his train, and much less so when he merely sees an object as to which he has doubts. But when it is discovered, and he has reason to believe that for any reason it will not leave the track, he must stop the train, if necessary, for its safety. An engineer may rightfully presume that a person on the track will leave it on the approach of a train, until the contrary is in some way manifested. Of course, when the engineer knew the fact of these small children being on the track, he had sufficient reason to know that they would remain, and he was at once charged with the highest

degree of care in their behalf; and this is the theory upon which the cause was submitted. The occurrence was sadly unfortunate, but the misfortune is not the fault of the railroad company. Its track was made a playground by the children, probably without the fault of anyone, as they were themselves under years of discretion. The misfortune does not, of itself, create a liability for damages. It was really, in view of the circumstances, unavoidable. Had the court, at the close of plaintiff's direct evidence, directed a verdict for the defendant, its action would not have been disturbed, as there was absolutely a failure to show negligence on the part of the defendant. Other questions argued are controlled by our discussions, to some extent, and as to others we find no error, and they are not of such importance that this opinion should be extended to consider them. The judgment is AFFIRMED.