BIAS v. CHESAPEAKE AND OHIO RAILWAY COMPANY.

Submitted January 20, 1899—Decided April 15, 1899.

SYLLABUS BY THE COURT.

1.  PLEADING—*Declaration—Railroads—Death by Wrongful Act.*
    A declaration for negligent killing, which charges, in effect, that the deceased, while on the track of the defendant, was carelessly and negligently pushed against, and struck by, a locomotive engine and cars belonging to the defendant, and in the control, custody, and management of its employes, and thereby received injuries from which she died, is sufficient.   (p. 354).

2.  EVIDENCE—*Death by Wrongful Act—Railroads.*
    Testimony of witnesses relating to the physical condition of the place and its surroundings where an accident occured is proper evidence to go to the jury.   (p. 355).

3.  NEW TRIAL—*Exceptions—Record—Waiver.*
    Numerous objections and exceptions to evidence taken during the progress of the trial, unless shown, by proper order or bill of exceptions, to have been specifically brought to the attention of the court on motion to set aside the verdict of the jury, will be regarded as waived.   (p. 354).

4.  RAILROADS—*View by Jury—Instructions—Harmless Error.*
    The fact that a small dress, belonging to, and worn by, the deceased when injured, is placed by the sheriff on the railroad

track at the point where the accident occurred, while the jury are viewing the place and its surroundings, and while they are looking down the track from the point the engine first came in sight of the deceased, is not sufficient misconduct to require the discharge of the jury, nor, after a cautioning instruction, is it sufficient error to justify the setting aside their verdict; it being merely the illustration or demonstration of a physical fact, about which the defendant can introduce contradictory evidence or can examine the plaintiff's witnesses.   (p. 355).

5.  INSTRUCTIONS—*Record.*
     Instructions copied in, but not properly a part of, the record, will not be considered by this Court.   (p. 354).

6.  RAILROADS—*Negligence—Trespassers.*
     The negligent killing of helpless trespassers on the track by its employes is one of the risks that a railroad company assumes in accepting the donation of its franchises from the public, and in undertaking to operate a railroad through an inhabited country.   (p. 354).

7.  RAILROADS—*Negligence—Trespasses—Proximate Cause.*
     If the employees of a railroad company, fail to keep a proper lookout, consistent with their other duties, for helpless trespassers on the tracks, and thereby such helpless trespasser is negligently killed, such failure is the proximate cause of such killing, and the company will be liable therefor, notwithstanding the prior negligence with which such helpless trespasser may be on such track.   But, if such trespasser is not helpless, the duty of keeping a lookout devolves upon him as well as the trainmen, and if an accident happens by reason of their mutual negligence, no recovery can be had.   (p. 358).

8.  NEGLIGENCE OF PARENTS.
     The imputed negligence of parents discussed.   See both opinion and dissenting opinion.   (p. 359).

Error to Circuit Court, Cabell County.

Action by John E. Bias, administrator, against the Chesapeake and Ohio Railway Company.   Judgment for plaintiff, and defendant brings error.

*Affirmed by Divided Court.*

SIMMS & ENSLOW, for plaintiff in error.

O'BIERNE & McDERMIT and E. M. McCALLISTER, for defendant in error.

DENT, PRESIDENT:

"On the 12th day of July, 1897, plaintiff's intestate, Clara Edna Bias, an infant, about fifteen months old, had strayed away from the home of its parents, which was

about 50 yards away, and gotten upon the track of the defendant, near Wilson's Station, a flag stop between Guyandotte and Barboursville, at about 7 o'clock in the evening, and was struck by defendant's local passenger train No. 13, going west, and afterwards, on the 16th, died. The train was running at the rate of between 45 and 48 miles an hour when the child was discovered on the track, about 150 to 200 yards ahead of the train." This abstract is taken from defendant' petition.    It was further shown in evidence that there was a clear view of the point on the track where the child was struck eastward six hundred to seven hundred yards, in the direction in which the train was coming.    There were no obstacles in the way, and it was a bright, sunshiny evening.    The child had been at home about ten minutes before it was struck.

The engineer testifies that he did not see the child until he was about two hundred yards of it,  and  he first thought it was a red rooster, and, as soon as he recognized it to be a child, he made every effort to stop the train, and managed to stop it in five hundred and ninety feet, but too late to save the child; that there was both a glare of light and shadow along the track, which interfered with his vision; that he was keeping a vigilant lookout, consistent with his other duties; that the train was behind time, and he was running rapidly to make it up; that he was looking right over the spot where the child was, to see if there was any signal to stop at Wilson's Station, just beyond.    The fireman's evidence was about the same as the engineer's. There is some attempt to show that the child's life might have been saved by an operation after it had been struck, but this is merely speculative, and beyond the range of possibility into the realm of miracles.    The attorneys could just as well contend that the child was not killed by being struck by the train, but by the operation performed by the physicians, cutting its skull open in an attempt to remove the pressure on the brain.    The jury heard the evidence, and found a verdict in favor of the plaintiff for one thousand dollars.    The defendant made a motion to set it aside, as contrary to the law and the evidence. The circuit court overruled the motion, and entered judgment.

The defendant relies on the following assignments

of error. (1) The court erred in overruling defendant's demurrer to plaintiff's declaration. (2) The court erred in allowing the plaintiff's attorneys to ask the witnesses, John E. Bias, Mrs. J. E. Bias, and John Wilson, 'How far east of the point where the child was struck could a person standing on the track see an object the size of the child in controversy, at that point?' (3) The court erred in allowing questions 5 and 6, on page 82, to be asked J. E. Bias, and question 1, on page 83, to be asked Mrs. John E. Bias, and in refusing to strike out the answers thereto. (4) The court erred in allowing a supposed rule of the company to be read to the jury, which was not shown to be a rule of the company in force at the time of the accident. (5) The court erred in allowing John Reid and W. W. Poindexter to express opinions to the jury as to the distance in which an emergency stop of a train of the description of the one in controversy could be made, they not having been shown to have had sufficient knowledge to give expert evidence. (6) The court erred in refusing to sustain defendant's objection to questions 1, 2, 3, and 4, on page 120, asked J. H. Williams on cross-examination, and in refusing to strike out the answers thereto. (7) The court erred in allowing questions 3, 4, 5, and 6, on page 144, to be asked John Clark, and in refusing to strike out his answers thereto, as said questions, regarding his seeing a chicken on the track, were irrelevant and misleading, and the asking and the answering of each of said questions was to the prejudice of your petitioner. (8) The court erred in refusing to discharge the jury upon the filing of the affidavits of F. B. Enslow, W. O. Walton, and O. J. Wilkinson, and the counter affidavit of Gordon O'Bierne, and in refusing to set aside the verdict of the jury when rendered, because of the experiments made by the jury, or in their presence, while viewing the ground at the place of accident. Said experiments, not being in the presence of the court, were illegal and improper, and the jury, standing some six hundred yards east of the point of accident, were surrounded by very different circumstances from those surrounding the engineer on a moving train, and these said experiments were greatly to the prejudice of the petitioner. (9) The court erred in giving plaintiff's instructions 1 and 2. No. 1 does not correctly state the law,

is inconsistent with instructions giving for the defendant, and misleads the jury. The jury, out of court and out of the presence of the judge, having taken evidence by way of experiment, should have been discharged, and not instructed, in plaintiff's instruction No. 2, to disregard the experiments made by them; for this was wholly ineffectual to erase any impression that may have been made on the minds of the jury by the experiment. The making of this experiment was upon a point vital in the case, and was to the prejudice of this petitioner. (10) The court erred in refusing to set aside the verdict of the jury, as contrary to the law and the evidence."  ,

As to assignments Nos. 3, 4, 5, 6, and 7, it is sufficient to refer to the rules laid down in the cases of *State* v. *Harr*, 38 W. Va. 59, (17 S. E. 794), wherein it is held that "to make available in the appellate court an objection taken during the trial to the admission of evidence, the point must be made and properly saved by some bill of exceptions. It is not enough merely to note the objections and exception in the certificate of evidence." Syl., point 4. And *Gregory's Adm'r* v. *Railroad Co.*, 37 W. Va. 606, (16 S. E. 819 Syl., point 2), in these words: "A motion for a new trial should indicate, in a way sufficient to call the attention of the court to them, the grounds for such new trial, unless the point has been made the subject of a bill of exceptions. Where it is claimed that evidence has been improperly admitted, and an exception noted, but no bill of exceptions taken, and the record states that the motion for a new trial was based on certain specific grounds, not naming the admission of such evidence, that exception will not be considered in the appellate court, but will be treated as waived." There are three bills of exceptions filed. The first relates to the refusal of the court to discharge the jury for improper conduct. The second contains the evidence, and also relates to the misconduct of the jury in experimenting with the dress the deceased had on. The third relates to the evidence showing how far a person the size of the child could be seen when struck, etc. Neither of these bills of exceptions refer to and especially include the testimony referred to in assignments Nos. 3, 4, 5, 6, and 7, nor does the motion for a new trial do so. Nothing

showing they were brought to the attention of the trial court on the motion for a new trial, they will be regarded as waived, and will not be considered by this court. Assignment No. 9 relates to the instructions, but, as these are not a part of the record, they cannot be here considered, although copied therein. *Trump* v. *Coke Co.* 46 W. Va. 238, (32 S. E. 1035).

This leaves assignments Nos. 1, 2, 8, and 10 for disposal. No. 1 relates to the demurrer to the declaration. Defendant's counsel insist that "the declaration fails to allege what duty, if any, the defendant owed to the plaintiff's intestate, or to allege any facts from which such duty could be intelligently inferred, and a breach of that duty." The declaration alleges that, "on the said defendant's said railroad near where it passes a flag station, known as Wilson's Switch, in said county, between the station at the said town of Barboursville and the station at the said town of Guyandotte, the said defendant, by its servants and employes," defendant negligently ran its locomotives, engines, tenders, railroad cars, and carriages, with great force and violence, against Clara Edna Bias, injuring her so badly that she subsequently died. One locomotive, tender, and cars would have been sufficient, but the others and carriages may be deemed surplusage. From this the duty that the company owes to every human being on its track, whether employe or not, to preserve life if possible, and not destroy it negligently, may be intelligently inferred from the language used. The breach of such duty was the negligently killing of the deceased. It can hardly be maintained, at the present time, at least, that a railroad company can negligently kill any one on its tracks, whether passenger, employe, stranger, trespasser, adult or child. It holds its tracks for the public good by sufferance of the people, and, though it cannot be hung, electrocuted, or imprisoned, it cannot take human life with impunity. For death caused by its negligence it must answer in damages. In the case of *Railroad Co.* v. *Whittington's Adm'r* 30 Grat 810, the fault of the declaration was that it did not show where the deceased was at the time he was killed (See Syl., point 2, p. 805), or how he was injured. The present declaration shows both where and how, and comes

within the case of *Poling* v. *Railroad Co.* 38 W. Va. 645, (18 S. E. 782).

The second assignment seeks to exclude from the jury the evidence of witnesses as to the distance it was possible to see a child of the size of the decedent along or on the railroad track, in the direction in which the train was coming. The evidence is perfectly competent. It is a physical fact easily contradicted if false, and, while the witnesses were not on a rapidly moving train, engaged in its management, yet the jury had a right to know the condition of the place of accident. This evidence was hardly necessary, after the jury was taken to view the place, as they could see for themselves whether the physical fact existed or not.

The eighth assignment is to the fact that the sheriff took the dress of the deceased, and placed it on a stick about eighteen inches high at the point of the accident, and allowed the jury to proceed up the railroad in the direction the train was coming, and observe how far such object could be seen. This is but the mere demonstration of a physical fact, and not an experiment. Nor is there anything about it that could possibly mislead the jury, as it is certainly possible for them to distinguish between a man in charge of an engine at a high rate of speed and one standing still on the ground. This is a matter also susceptible of proof, and the jury has the right to hear and weigh the evidence. It is admitted that the court, out of precaution, directed the jury to disregard the dress demonstration. All it showed, however, was how far the dress, in the position it was placed, could be seen by a person standing on the track,—a mere physical fact, as the view of the rails, track, and surrounding country were, which was shown to the jury for the purpose of enabling them to more clearly understand the facts given in evidence, and arrive at a correct verdict. It is impossible to understand how the fact that they could see this little red dress for eight hundred yards or more could in any manner induce them to agree to a verdict contrary to the law and the evidence. Such use of the little red dress, if error at all, could only be regarded as harmless error. Thomp. Trials, section 905.

The tenth and last assignment of error relates to the

motion to set aside the verdict as contrary to the law and the evidence. It is now the settled law that this Court will not reverse a judgment founded on the verdict of the jury unless the evidence plainly and decidedly preponderates against the same. *Trump* v. *Coke Co.* before cited; *Gilmer* v. *Sidenstricker*, 42 W. Va. 52, (24 S. E. 566). In the present case the vast preponderance of evidence shows that it was possible for the engineer to have seen the child eight hundred yards away, and that he could stop the train, as he did do, in less than two hundred yards. The engine was going at the rate of forty-eight miles per hour, to make up lost time. It ran the four hundred yards in which it was in sight of the point where the child was killed, before the engineer saw it, in twelve seconds. This was too short a time for the child to have gotten on the track. Hence it must have been there when the train came in view of it. So there was no physical obstacle in the way of the engineer's seeing the child. If we follow the old rule and exclude the defendant's contradictory evidence, we must sustain the verdict; for the presumption arises that, if the engineer failed to do what he could have done, then he was not keeping the lookout the law requires. He testifies that he was looking straight ahead all the time, right across the place where the child was struck, for a signal at the next station. He was trying to make up for lost time, was running rapidly, was seven minutes late, and trying to make Huntington on time. His mind was intent on his business, and he was not keeping lookout for such small trespassers on the track. The engineer's excuse for not seeing the child before he did was because there was a glare of light on the track in some places, and a shade in others, which made it very difficult to see an object so small as the child for any distance. A little over two hundred yards from it he first noticed it, and thought it was a red rooster, but, on closer inspection, he saw it was a child, and he immediately reversed his engine, put on the air brakes, and did all in his power to save it, and failed. With the engineer's evidence expunged, the physical facts and circumstances sustain the verdict, and his evidence as to the rate that he was going, his intentness in making up lost time, and watching for the signal at the next station, rather tend to sustain the verdict, as showing that neither

his mind nor eye was following the track for trespassers. No one could cherish the thought for a moment that he purposely killed the child. Nor is such a question presented for consideration. But the sole question is as to whether he was keeping such lookout for helpless trespassers on the track, consistent with his other duties, as the law requires, or was he negligent in this respect. "We cannot here reject the witness, nature telling us that the sharp eye of an engineer, more surely than the unpracticed eye, will almost certainly see, in bright daylight, a rock, log, or person ahead on a level, unobstructed track." *Gunn* v. *Railroad Co.*, 42 W. Va. 676, (26 S. E. 546). In this case the question of negligence is one of law and fact, and was therefore for the jury, under the instruction of the court. *Raines* v. *Railway Co.*, 39 W. Va. 50, (19 S. E. 565). It all depends on the evidence of the engineer. If his evidence is taken as true in all respect, then the verdict is wrong. If false in any particular, the jury have the right to reject it, they alone can pass on his credibility. "When the jury has discredited witnesses, and the circuit court has approved the verdict, it is a most hazardous thing for this Court to overrule them, because we cannot see the witnesses, observe their countenances, their gesture, their bearing and demeanor, as did the jury and the judge; we are not persons in the drama of the trial. We cannot see all the figures and incidents in the scene of the trial." *Gilmer* v. *Sidenstricker*, 42 W. Va. 57, (24 S. E. 568). "This doctrine especially applies where the credibility of witnesses is involved. Everywhere we can find it asserted." *Young* v. *Railroad Co.* 44 W. Va. 218, (28 S. E. 932); *Scott* v. *Railroad Co.*, 43 W. Va. 484, (27 S. E. 211); *Akers* v. *De Witt*, 41 W. Va. 229, (23 S. E. 669). It would be matter of pleasure to sustain the evidence of the engineer, if the law permitted it. The law takes his credibility from the court, and places it with the jury. He is an interested witness. His apparent negligence is the alleged cause of the accident, he would naturally want to relieve himself from blame, and remain in good repute with his employers. His future employment might depend thereon. The common law, through abundant caution, out of tenderness for the frailties of human nature, excluded the tes-

timony of those in interest, not for the reason that all
men, owing to interest, would swear falsely, but that many,
under great temptation, would either testify falsely, color
their evidence, or suppress the truth.   Our present law,
with more confidence in the integrity of human nature,
with but few exceptions, allows all witnesses, however
great their interest in the result, to testify, and leaves
their credibility, and the weight to be given to their evi-
dence, to their fellow men who compose the jury.   This
is a duty that cannot be imposed on  the court, and liti-
gants have the right to have it exercised by the jury, where
the law places it.   It is a constitutional guaranty.   The
engineer may have told the truth that he was keeping a
vigilant lookout, but that the glare of the setting sun, and
the shadow of the mountain along the track, interfered
with his vision, and prevented him from seeing the child
until too late to save it.   But the jury to whom this ques-
tion was submitted has said not.   The trial court has sus-
tained their finding.   The trial court may have done wrong,
and the jury may have done wrong, but it is about a mat-
ter of which they are the exclusive judges, and with which
this court is powerless to interfere.          ,

Nor does the question of contributory negligence arise
in this case.   The parents of the child were certainly neg-
ligent in a degree in allowing it to wander upon the track.
For this they have been severely punished by the suffering
and loss of their child.   Negligence, to be contributory,
must be a proximate cause of the accident.   This action
is founded on the theory that after the defendant became,
or could have become, aware of plaintiff's negligence by a
proper lookout, it was guilty of an act of negligence in not
keeping such lookout, which became the sole proximate
cause of the accident.   In other words, if the lookout the
law requires had been kept, the accident would not have
occurred, but would have been avoided, notwithstanding
the prior negligence of the plaintiff.   *Schwartz* v. *Shull*,
45 W. Va. 405, (31 S. E. 914); Beach, Contrib. Neg. section
54; Shear. & R. Neg. (5th Ed.) section 99; Thomp. Neg.
1157, note.   The question of contributory negligence, if
it did arise, was also for the jury, as it was a mixed ques-
tion of law and fact.   The parents did not permit their
child to play on the track, but, in an ungua·ded moment,

it slipped away from them, and was only gone a short space of ten minutes, when, returned to them in a dying condition. The eyes of parents cannot continually be on their children, but, like the engineer, they have other duties to perform which require attention; especially the poorer classes, in this country forced to continually struggle for the means to support themselves and their families. They cannot have nurses and golden cradles, and build palaces in which to protect their children from danger. They can only be required to use such care as their circumstances will admit of, which must be determined by the jury, from the facts in evidence. In this case the jury found for the plaintiff. The judgment is affirmed by a divided court.

BRANNON, JUDGE:  (*dissenting.*)

Still holding the views I expressed in *Couch* v. *Railway Co.* 45 W. Va. 51, (30 S. E. 147), I must say I would reverse the judgment. The company is held liable because it did not keep a sufficient lookout to discover persons on its track. The great volume of decisions agrees with 3 Elliott, R. R. section 1257, that "it is generally, and, we think, correctly, held that a railroad company is not bound to keep a lookout for trespassers on the track." 19 Am. & Eng. Enc. Law, 935; *Ward* v. *Pacific Co.* (Or.) 36 Pac. 166; *Burg* v. *Railroad Co.*, (Iowa) 57 N. W. 680; *Spicer* v. *Railroad Co.* 34 W. Va. 514, (12 S. E. 553); 2 Wood, R. R. section 320; *Railroad Co.* v. *Dunnaway's Adm'r*, 93 Va. 29, (24 S. E. 698). Under this rule, the company could not be made liable, as this rule only requires that, after discovery of the child, the trainmen shall not willfully injure it, but do all in their power to save it; but the company is held liable because the engineer could and should have, by a lookout, sooner seen the child. I admit that the West Virginia law requires this lookout as to children. Admitting the West Virginia rule, as the law elsewhere is different, I think we ought to have a plain case to make the company liable for a misfortune occurring in the lawful use of its property in the work enjoining upon it by the public franchise. Admitting the West Virginia rule, I say the company is not liable. Why? The plaintiff must clearly show negligence. He must show clearly that a lookout would have revealed the child in time to save it.

I say that no evidence makes it appear, with any degree of certainty, that it was on that track to be seen in time. It had been gone fifteen minutes. The day before it was lying by the side of the track playing in the sand. It was fifteen months old, just beginning to walk,—could scarcely walk. How likely, then, that, hearing the train, it suddenly got on the track, when the train was one hundred and fifty or two hundred yards away. As it could not walk, likely it crawled on the track. When? We cannot say. Take the uncontradicted evidence of the engineer, and he seems fair and intelligent, and the fireman says the same. The child was in a cut at seven o'clock p. m. in July. The engineer says: "I don't know that I could prepare the language to express my position at the time the accident occurred or just before. I want to state, as the jury knows, there is a mountain, which is higher there at the bars than it is on this level, straight track above there. The sun was about ten or fifteen minutes high over the top of the mountain. That straight track is five hundred and fifty-five yards long, and about three-quarters of that distance was shaded. It shaded that part of the track where the child was at, and also shaded the track up about half way to that cinder pit. The sun was shining not exactly to the front of me, but a little to the right, on the two steel rails. A train runs over these rails every two or three hours in the day, and they are therefore polished up so that they glitter and glisten in the sun the same as a looking-glass would, and the rays of the sun reflecting on these rails penetrate the eyes, and has the same effect as if it were shining on a looking-glass, and it is blinding. You cannot see through these rays of the sun into a shade, and see an object. If the sun had been shining on the track clear up to the spot where the child was, I could have seen it sooner, or if it had been shady where I was, on a straight line, I could have seen it better; but, looking through these rays penetrating from the rails into a shady spot, you cannot see an object. It is impossible. When I got down to the cinder pit, my fireman said, 'What is that, Jim?' and I looked, and I saw something on the track, but thought, at first, it was a red rooster. It must have been down on its hands and knees, for that second it raised up, and I said, 'My God, it's a child!' At the same moment I threw

off the steam, grabbed the air brakes, and threw it around, grabbed the whistle, and 'toot! toot! toot!' three or four times.    I grabbed the reverse lever with my left hand, and the throttle with my right, and then worked the sand lever backwards and forwards. I did all I possibly could to stop the train.    Gentlemen, if it had been my own child at that time I could not have done more.    Every mechanical appliance I had at my command was put into emergency.    *    *    *    It looked to me like a red rooster.    It was down on its hands and knees, and at that time the fireman said, 'What's that, Jim?' and it raised up about that time, and if it had been on the track before that time I think I could have seen it, if it had been standing up.    It must have crawled onto the track just at that time."    The fireman said the child was on its hands and knees when he first saw it, and looked like red paper.    It had on a red dress.    Their uncontradicted evidence shows that they did not, most likely could not, by diligence, see the child till within one hundred and fifty or two hundred yards of it, if it was on the track even, the train running forty-five to forty-eight miles an hour. Passengers tell of the sudden shock from efforts to stop the train,showing the suddenness of discovery of the child, and the great effort to save it.    Both engineer and fireman swore they kept a careful lookout.    Only conjecture will assert that the baby was on the track or standing up so as to be seen.    The verdict has no sound basis, and is against evidence of witnesses discredited only because they were employes of a railroad, and is the verdict of mingled sympathy and prejudice.

I do not think that, in any view, the plaintiff can recover, as he is father of the child, and gets the recovery, and is guilty of negligence in not watching and providing against accident.    His house was fifty yards from the railroad.    He and his wife both knew the child was just beg'nning to walk, and would be disposed to go to the track. It did go the day before to the sand by the track, and play there ten or fifteen minutes, before it was taken away.    The bars at the track were either usually down, or, if not, the lower bar was twenty inches from the ground, so the child could crawl under.    This very day the child was on the porch with the father, and he saw the child slide off the

porch, and go around the house, as he says, and he talked on to some one there, and paid no attention to the child, thinking she had gone to the kitchen. This shows that he noted her absence. Parents are watchful of children of this age usually, especially when there is known danger at hand, and a child can so easily get to that danger,—a railroad, with trains passing any moment. When the child is itse'f alive, and sues for damages, the negligence of the father is not imputable to it; but where it is dead, and the father is the sole beneficiary, his negligence prevents recovery, as I stated in *Gunn* v. *Railroad Co.* 42 W. Va. 676, (26 S. E. 564). I cite the following additional authorities: City of *Evansville* v. *Senhenn*, (Ind. Sup.) 47 N. E. 634. In that case, as also in 7 Am. & Eng. Enc. Law (2d Ed.) 449, note 2, it is stated as clear, in all jurisdictions, that where the parents sue their negligence bars. Note in *Railway Co.* v. *Schuster*, (Pa. Sup.) 57 Am. Rep. 474 (s. c. 6 Atl. 269); *City of Peken* v. *McMahon*, (Ill. Sup.) 39 N. E. 484; Patt. Ry. Acc. Law, 76; *Williams* v. *Railroad Co.*, 15 Am. & Eng. R. Cas. 403. This case is exactly like *Grant* v. *City of Fitchburg*, 160 Mass. 16, (35 N. E. 84), where the mother of a child twenty months old saw it fifteen minutes before the occurrence at the gate on a street, and went on talking with another woman in the rear of the house, and it was killed by falling into a hole in the street. The administrator was denied recovery because of the mother's negligence. The child had been on the street the day before, and had to be brought home. It was a greater negligence in the father of this child to allow it to go on a great railroad, with trains passing any time, than to allow that child to go into the street. How can the father blame, when, knowing the danger, he paid no care to the child? 1 Shear. & R. Neg. section 72 (5th Ed.), says that people, though poor, must take care of children; and that the question is "whether the plaintiff took as much care of the child as reasonably prudent persons of the same class and with the same means ordinarily do." Now, it required no wealth or nurse to guard this little child from going to play in the sand at the railroad,—a known danger, known to be within its reach. It was gross neglect not to pay the ordinary care given by every person to a child walking in the presence of a yawning danger. A parent of limited means must do all that can

reasonably be expected from one in his condition·" Beach, Contrib. Neg. section 142 (3d Ed.). Was it not within the parent's ready means and ability to see to this little one on this particular occasion? He was at leisure. Hardly a plainer case of negligence could be put.

JUDGE ENGLISH concurs with me.

*Affirmed by Divided Court.*