EMIL KLANOWSKI v. THE GRAND TRUNK RAILWAY COMPANY.

[See 57 Mich. 525.]

| 64 | 279 |
|----|-----|
| 71 | 86  |
| 64 | 279 |
| 77 | 155 |
| 64 | 279 |
| 86 | 433 |

*Negligence of railway company—Charge to jury—Regulating speed of train—Variance between proof and allegation in declaration—Evidence—Province of jury.*

1. In a suit against a railway company for damages suffered by plaintiff by being run over by defendant's train, the circuit judge instructed the jury that the speed at which the train was running at time of the accident was not negligence, and that, at a *common* highway crossing, there was no duty to reduce the rate of speed; that if the bell and whistle were not sounded as required by statute,[1] and this contributed to the accident, the defendant would be liable, in absence of fault on plaintiff's part, but, if so sounded, there could be no recovery; and then left it to the jury to determine whether there was any *unusual* circumstance which made the speed unreasonable.   The declara-

[1] How. Stat. § 3375; amended by Act No. 234, Laws of 1885.

tion alleged no *exceptional* circumstances as relied on, and the testimony showed none.

*Held*, that this created a contradiction, and left the jury to find that a full compliance with the statutory conditions, which they had already been told would be a defense, was not a defense.

2. In the law, *all* crossings of highways by a railroad are classed together, and, if there is any reason why a *particular* crossing is more dangerous than others, it should be *averred* and proved.

3. There is always room for dwelling before a jury, if it is allowed, on the perilous character of a fast train; but the law allows it, and has imposed what the Legislature consider sufficient guards against danger from it. On the other hand, nothing could be more dangerous than irregular running. Reliability in the movements of trains is necessary for the protection of the numerous lives on the trains themselves, which exceed in number any likely to be found at any crossing. Time lost by slowing at one place must be made up afterwards, and any considerable loss always creates danger. Persons at crossings can always inform themselves sufficiently of the times and conditions of passing, and accidents do not happen very often where both parties are reasonably vigilant.

4. It is never safe or proper, in cases where sympathy is easily aroused, to leave any door open for finding verdicts on supposed equities or surmises. (Per CAMPBELL, C. J.; CHAMPLIN and SHERWOOD, JJ., concurring.)

1. Where a declaration against a railway company for injuries sustained by the alleged negligent running of its train laid the injury as done at a *certain* street crossing, and averred defendants duties accordingly, and the proof showed that the collision occurred at another crossing, several rods distant,—

*Held*, that a verdict for the plaintiff could not be maintained, the variation being covered by an assignment of error.

2. It is never proper to leave to witnesses the determination of matters which can be determined by the jury.

So *held*, in a case where plaintiff's witness testified to experiments made by him regarding the probability of being able to reach and cross a railway crossing in advance of an approaching train, plaintiff having been run over in attempting to do so.

*Held*, further, that the testimony of the same witness as to the speed at which the train was running at time of his experiments was objectionable, he professing to fix the period of the experiment at 55 seconds, but giving no certain *data* as to the distance traversed by the train during the time. (Per CAMPBELL, C. J.; CHAMPLIN, J., concurring.)

Error to Wayne.  (Chambers, J.)   Argued October 12 and 13, 1886.  Decided January 20, 1887.

Case.  Defendant brings error.  Reversed.  The facts are stated in the opinion, and in 57 Mich. 525.

*E. W. Meddaugh* (*Edwin F. Conely*, of counsel), for appellant.

*Griffin P. Warner*, for plaintiff.

CAMPBELL, C. J.  This was a suit brought to recover damages suffered by plaintiff in the same transaction that resulted in the death of his father, on behalf of whose estate a recovery was had, affirmed by division of this Court in the case of *Klanowski v. Grand Trunk Ry. Co.*, 57 Mich. 525.  In the present case some new facts were brought out, and the record presents some questions not fully developed before.  Plaintiff recovered damages.  It will not be necessary to give many details, as they would be to some extent a repetition of the old decision.

We observe that all of the counts in the declaration in this cause lay the injury as done at the crossing of Chene street, and lay the duties in reference to that crossing.  The occurrence was not at that crossing, but at one north-east of it, on the Miller road.  The briefs do not lay stress upon this variance, which is a very serious one.  If the declaration is printed according to the original record, it is plain enough that it cannot maintain the verdict, as an error assigned is that the plaintiff could not recover on the showing.  As, in our opinion, a new trial must be granted on other grounds, we make no further allusion to it.

The facts, as presented for plaintiff, though controverted in many respects in important details, are, in substance, these:

On June 23, 1883, at a little after 9 o'clock in the evening, the Grand Trunk Railway train, approaching from the north-east, struck a two-horse wagon in which plaintiff and his

father were sitting; the locomotive hitting it in the forepart, and throwing out the persons in it, killing the father and severely injuring the plaintiff. This was on Miller street or road, which at that place was crossed by the railroad at an angle of about 35 degrees. Chene street runs at right angles with the Miller road, which it crosses about 10 rods northerly from the railroad track, and the Chene-street railroad crossing is not far from 20 rods distant from the place of the accident. Plaintiff lived on Chene street, according to the map in evidence, about 30 rods south of the railroad. Some of the testimony, which is vague, puts it further. About 135 rods along the railroad from the place of the accident, northeasterly, is a crossing on the Conet road, known as the Bigelow crossing. This Conet road is nearly parallel with Chene street, and crosses the Miller road some 80 rods, or thereabouts, southerly from the railroad.

That afternoon plaintiff had walked up Chene street to the railroad, and along the track to the Miller crossing, and then followed the Miller road to the Conet road, and along that road, across the railroad, to a place where his father was at work plowing. In the edge of the evening they left the field, in a wagon drawn by two horses, and followed down the Conet road to the Miller road, and then turned into that, and drove in the direction of the railroad and Chene street. They stopped at Miller's house, about 30 rods from the railroad, and not far from three-quarters of a mile from the field, along the road they traveled. The father went into Miller's, and stayed there a good while, the precise time not being fixed. He came out again, and got into the wagon, which the boy was driving, and they started up the road on a walk. The witnesses put the time not far from a quarter past 9. The boy, who was about 14 years old, sat at the right side of his father, on a board seat laid across the wagon. The train from Port Huron was a few minutes past due, and running about 40 miles an hour, or a little more. The Miller road

was rather lower than the highest part of the railroad track, and began to rise when it approached the track, and crossed the railroad ditch on a plank bridge, which was laid diagonally along the direction of Miller street, and was, as claimed by plaintiff, about eight or nine feet long.

Plaintiff says that when he came opposite the telegraph pole, which is not exactly located, but seems to have been near the intersection of the Miller road with the railroad, he stopped and listened, but heard no noise and saw no light. He then drove on, and paid no further attention to anything but his driving. The horses were on the track, and apparently just over it, or nearly so, when the locomotive struck the team and wagon.

The plaintiff's claim is that he was careful, and not negligent, and that defendant was negligent in omitting the statutory signals, and in running too fast. Defendant denies its own fault, and claims that plaintiff was careless himself. No specific neglect is charged, except omitting the statutory signals. One of the counts puts the speed at 40 miles, and perhaps it charges inferentially that this was too fast.

On the trial, and in this Court, considerable stress was laid on the fault of the railroad in leaving a growth of bushes on its right of way in and beside the ditch, tending, as claimed, to obscure the view of the road. There was evidence that there was a growth of bushes along that part of the Miller road further than the telegraph pole. There was a conflict of testimony concerning the bushes near the track, and concerning their height. Plaintiff represented that he saw the dim outline of those bushes between him and the railroad when he stopped to listen. There was positive testimony on the other side, and some on his side, not consistent with any such difficulty. He testified he did not hear or see anything indicating the approach of the train. There was testimony of witnesses on both sides, of several persons who were near by, who both heard and saw the train plainly.

There was positive testimony that all the proper signals were given. There was testimony, on the other hand, of persons who did not hear all the requisite signals.

Upon the two main issues, namely, defendant's carelessness and plaintiff's care, the conflict of facts is alleged to have existed.

All of the testimony concerning plaintiff's own conduct is what he says himself. There is some further testimony intended to supplement it by showing the surroundings.

In dealing with the question of plaintiff's care, less attention was given than should have been to the fact that plaintiff's father was with him, and more or less familiar with the neighborhood. It is certainly remarkable that neither of them discovered what was seen and heard by so many others. There can be no doubt that when they reached the bridge crossing, if plaintiff had gone to his horses' heads, and looked up the track, he could not have failed to see the train, whether he could have heard it or not; and with two in the wagon, if both had their wits about them, there should have been no difficulty in taking the necessary observations. It is very difficult to distinguish the case from many which appear in the reports where persons approach crossings with stolid indifference, and are injured by trains passing. Except the one stop near the telegraph pole, no attention seems to have been given to the situation. It is not necessary to the decision of this case to determine—and in the absence of some explanations which the jury may have had, and we have not in a sufficiently tangible shape, we cannot fully determine—whether there was not evidence enough of care to go to the jury. It is evident the jury gave plaintiff the benefit of all the doubts.

Objection was made to the testimony of Mr. Voelkner, who represents plaintiff in this suit, and gave an account of some experiments he made under what he supposed to be similar circumstances. He says, in substance, that he went out with

his brother in a wagon like plaintiff's one night in the following August, and placed himself, without measurements, as he says, about where the boy told them he stopped, and watched for the approach of the train. He put his wagon on the Miller road, and says "somewhere near the telegraph pole, and at 9:30 we saw a light." This was, as he says, before the bushes were cut away. He then gives this account:

"There was a light; that is, the head-light. It appeared, and I left my brother standing in the wagon, and I jumped out, and walked to the track to see how long it would take. That was the purpose I went out there to see,—how long it would take to walk to the track; and I walked rather fast, and at the time I got to the track the train was there passing me; and I took the time, and it took fifty-five seconds; that is, the time I saw the light and I jumped out of the wagon and got to the Chene-street crossing."

He says he considered the train was running 45 miles an hour, the same that it was running the night of the accident. On his cross-examination, he indicates that he proposed to imagine himself as Klanowski driving the horse, and find out the exact time it would take from seeing the light till the train struck the crossing, and that he ran instead of walking. On the redirect he said it took him the 55 seconds to run 65 feet.

It is not unlikely that this peculiar experiment had weight with the jury. It does not appear just how he measured the time, and it is a remarkable showing of running that traverses but a little over a foot in a second. At two or three miles an hour, the crossing would have been made safely on this basis. But the testimony was not admissible. It is never proper to leave to witnesses the determination of matters which can be determined by the jury. With the facts established in regard to the various elements of plaintiff's story, their effect would be within the estimate of any intel-

ligent jury.   The facts themselves must be determined be-
fore any conclusions could be drawn from them.[1]

In *People v. Morrigan*, 29 Mich. 4, an attempt was made
to show by experts whether certain things could or could not
be done, involving no science, but ordinary facts, and the
testimony was held to have been properly excluded.   In the
same case, where the distinct fact was material whether a par-
cel of a certain size could be taken out of a pocket which
had been changed, actual experiments with such a parcel in
the pocket, before it was changed, were held proper, as in-
volving a single and determinate fact, showing the capacity
of that particular pocket, which was no longer within reach.
The distinction is obvious.   In the present case, even if ex-
periments could be of any use, Voelkner took for granted
distances, locations, and probabilities of speed, none of which
had been or could be verified.   There were no elements of
certainty in the comparison, which, to be of any value, must
have been exact, and beyond dispute or variation.

His testimony as to speed on the same night when he ex-
perimented was also objected to, and the objection was well
taken.   While he professed to fix the period of the experi-
ment at 55 seconds, he gave no certain *data* as to the distance
traversed by the train during that time.

There were several objections to the course of the judge in
his charges, which can be best referred to by comparison.

The judge confined his charge to giving or refusing specific
requests, except that, in a few instances, he qualified some of
defendant's requests.   The jury had no general cautions or
instructions, and the case was one where they needed to be
very carefully charged, and where any ambiguity was likely
to mislead them.

The court charged, in answer to certain requests, that the

---

[1] See *Laughlin v. Street Railway Co.*, 62 Mich. 221 (head-notes 3, 4);
*Woodbury v. City of Owosso*, 64 Id. 239.

speed of the train was not negligence, and that, at a common highway crossing, there was no duty to slow down, or reduce the rate of speed.[1] He charged that if the bell and whistle were not sounded as required by statute, and this contributed to the accident, defendant would be liable, in case there was no fault in plaintiff. He also charged that if they were rung there could be no recovery. But after this charge, which made the ringing and whistling a sufficient defense, he left it to the jury to determine whether there was any unusual circumstance which made the speed unreasonable. This created a contradiction. It left the jury to find that a full compliance with the statutory conditions, which they had already been told would be a defense, was not a defense. Nothing in the declaration or charge pointed out any exceptional circumstances relied on, and the testimony showed none.

In the law, all crossings of highways are classed together, and, if there is any reason why a particular crossing is more dangerous than others, it should be averred and proved. Here there was no averment and no proof of anything that distinguished the Miller crossing from any other. This charge directly empowered the jury to diregard what had already been said about the legal right to run at high speed. There is always room for dwelling before a jury, if it is allowed, on the perilous character of a fast train. But the law allows it, and has imposed what the Legislature consider sufficient guards against danger from it. On the other hand, nothing could be more dangerous than irregular running. Reliability in the movements of trains is necessary for the protection of the numerous lives on the trains themselves, which exceed in number any likely to be found at any crossing. Time lost by slowing at one place must be made up afterwards, and any considerable loss always creates danger.

---

[1] Defendant's fourth request was given, as follows: "There is no statute, ordinance, or other rule of law requiring railroad trains to slow down or reduce the rate of speed at common highway crossings, by reason of the mere fact of such crossing."

There is less danger from trains, whether fast or slow, which run on time, or nearly so, than from any others. Persons at crossings can always inform themselves sufficiently of the times and conditions of passing, and accidents do not happen very often where both parties are reasonably vigilant.[1] Every collision endangers lives on the train as well as other lives, and any rule which leaves conductors of trains in any doubt as to their duty would do more harm than good.

In other parts of the charge a similar difficulty occurs. The jury were left, on several matters, at liberty to conjecture or find difficulties which were not defined, and which the pleadings do not point out. As already suggested, the declaration is silent as to any negligence from the leaving of bushes by the track, and, except for plaintiff's testimony, there is very little, if anything, which indicates that they were of any consequence. They did not prevent Voelkner from seeing the head-light, and plaintiff only indicates difficulty at the single point where he stood, which is not clearly identified, and where he was apparently opposite bushes along the Miller road, over which the defendant had no control, and which seemed to have been as high as any others. The charge does not refer to them very distinctly, as bearing on any question of negligence of defendant, but does not ignore them, and, except for these, there was nothing that could indicate any difference between this and any other crossing, thus leaving the jury at liberty to find some difference, and find some additional duty in defendant as to its trains, from which they might infer negligence beyond what was counted on by the declaration.

It is never safe or proper, in cases where sympathy is easily

---

[1] See *Carver v. Detroit & Saline Plank Road Co.*, 61 Mich, 592, for statement of general rule governing the action of trial courts in actions for negligence.

See *Potter v. F. & P. M. R. R. Co.*, 62 Mich. 22, 23, as to duty of traveler at highway crossing.

See *Guggenheim v. L. S. & M. S. Ry. Co.*, 33 N. W. Rep. 166, as to care required on the part of railway company at city crossing.

aroused, to leave any door open for finding verdicts on supposed general equities or surmises.

It is impossible to suppose, in view of the record and the verdict, that there was no danger in leaving the jury the wide room for speculation which they had power to take. Leaving them the largest scope for legal discretion, we think they were permitted to go further.

There were some other points presented which seem to rest on similar questions, and which need not, therefore, be referred to more particularly.

The judgment must be reversed, with costs, and a new trial granted.

CHAMPLIN, J., concurred.

SHERWOOD, J. I concur in reversing this judgment, on the ground of the conflict in the charge pointed out by the Chief Justice.

MORSE, J. (*dissenting*). I can find no material difference between the record in this case and that in the case of *Klanowski v. Grand Trunk Ry. Co.*, 57 Mich. 525.

In that case the administratrix of the father of the plaintiff in this case recovered a judgment against the defendant, for the killing of the father by the same act and transaction which occasioned the injury to the son, for which damages were recovered in the present action.

The facts are so clearly set forth in the opinions filed in that case that I do not consider it necessary to again specify them. It is sufficient to say that, in my opinion, the question as to the negligence of the plaintiff and defendant were each properly submitted to the jury.

As to the discrepancy between the declaration and the proofs as to the name of the crossing, as the point was not raised in the court below, and no particular stress is laid upon

64 MICH.—19.

it in this Court, we shall disregard it.   It could have been
amended at the trial, if attention had been called to it, and
the ends of justice are not intended to be defeated by a mere
technicality.

A witness, Henry Voelkner, was permitted to testify that
on the sixteenth of August following the accident, which oc-
curred June 23, 1883, and before the bushes along the line
of the railroad were cut, he went with his brother, and
made some observations.   He went out with a wagon, with a
box upon it, with a board across the box, about the same as
the one described by the witnesses as being used by the Klan-
owskis.   The Voelkners placed themselves in this wagon,
about where the plaintiff in this case told them he and his
father stopped and looked and listened at the time of the
accident.   He then detailed what he saw and noticed when
the train came along.

This evidence was objected to as incompetent, irrelevant,
and immaterial, and an exception taken.

I fail to discover any error in the introduction of this tes-
timony.   It became a material question upon the trial as to
whether the bushes along the line of defendant's track had
any perceptible bearing upon the question of the plaintiff's
negligence in not seeing the head-light of the approaching
train.   It was competent for any person before the bushes
were cut to place himself in the same position the plaintiff
was, and testify what effect the bushes or the telegraph poles
had upon his vision.   It would have been competent for the
court, in his discretion, to have allowed the jury to have in-
spected the premises, if the bushes had not been cut down
before the trial, and to have thus determined, by their own
observation, the truth of the contested question, whether or
not such bushes obstructed the view of plaintiff.[1]   Such ex-
periments and observations are frequently made by witnesses,
and admitted without question.

[1] See How. Stat. § 7620.

Whether he stood in the right place, in the spot located by plaintiff, or whether such point was properly located by the plaintiff, were questions of fact, to be determined by the jury; but if they were satisfied that Voelkner was in the same place, and situated towards the track as the plaintiff was at the time of the accident, his testimony as to what he could see and hear was important and admissible.   If, as contended on the argument, and as would appear from the testimony, he saw the head-light of the train, his evidence in that respect was of more benefit to the defendant than the plaintiff; and this fact is cited in defendant's brief as a strong point in favor of the theory that plaintiff was negligent.

But it is objected that his testimony to the effect that, after he saw the head-light of the approaching train, he jumped out of the wagon, and walked rapidly to the track to see how long it would take, and that when he got to the track the train was passing him, and that it took him 55 seconds to walk 65 feet, was inadmissible, and tended to prejudice the jury against defendant.

It is urged that there were no elements of certainty about these comparisons; that it could not be certainly ascertained from his evidence what the rate of the speed of the train was, or where it was located when he first observed its head-light.   But it has been often decided that it is competent for a witness to testify as to his judgment of the rate of speed of a railway train; and while nothing is absolutely certain when the information to be obtained must pass through the mouths of witnesses, or depend upon their judgment, I fail to perceive how this evidence could have been of any detriment to defendant.

The defendant had within its power and reach the evidence of the speed of its train on both occasions, and the head-light, according to Voelkner's testimony, was observed as soon as it could have been seen from that point, as he stationed himself there before the train came in sight.   It is

claimed by the counsel for the defendant that the evidence of Voelkner tends entirely to establish the negligence of plaintiff, as he both saw and heard the train in time to avoid accident.

He does testify that while stopping there he both saw and heard the train. If the fact of his being allowed to testify that he got out of the wagon, and walked to the track, and thereby giving the time it took the train to pass the crossing after he first saw its light, was error, it certainly was a harmless one, as the controverted point was not the speed of the train, but whether the plaintiff stopped and looked and listened, and did not see or hear the train, as he testified.

I do not think the case should be reversed on this ground.

It is also complained that the charge of the court was not specific enough, and that the jury were left to draw improper inferences from the testimony, and were given an opportunity to find that there might be unusual circumstances which made the high rate of speed, not negligence in itself ordinarily at such a crossing as the one where the accident occurred, unreasonable, and therefore negligent, and without defining what these unusual circumstances should be in order to create negligence.

The principal negligence of the defendant relied upon and made prominent upon the trial was the neglect to ring the bell or sound the whistle for this crossing. The rate of speed of the train was of secondary importance.

The court was requested by the counsel for defendant to instruct the jury as follows:

"The evidence does not show that at or about the Miller crossing there was any such unusual or extraordinary circumstance or special danger, forbidding or making unreasonable the rate of speed at which the train was running when approaching this crossing."

If the court had absolutely refused this request, there would have been no error committed; as if, as claimed by

plaintiff, bushes were permitted by the defendant corporation to grow up and stand within its right of way, obstructing the view of approaching trains, a proper care and caution upon the part of the company would have necessitated a slowing up at this crossing. The court read the request, and then said:

"That is a fact for you, gentlemen, and I leave that to you to say whether there was any unusual circumstance."

I can find no error in this instruction. It is not likely, nor to be presumed, that the jury would go hunting around to find something not in the testimony, upon which to base negligence in this regard. It is evident to my mind that the negligence found by the jury was the failure to use the signals required by the statute; but if they had found that the rate of speed was unreasonable, under the conditions of the night and the crossing, I should not feel, by any means, impelled to disturb their verdict.

A careful consideration of the evidence and the charge of the court confirms my opinion, entertained upon the argument, that the judgment is right, and should be affirmed.