PEOPLE v. RAY.

1. CRIMINAL LAW—PRELIMINARY EXAMINATION—EVIDENCE—PROBABLE CAUSE—BINDING OVER FOR TRIAL.

Magistrate at preliminary examination may bind defendant over to circuit court for trial if it shall appear from the proofs that an offense not cognizable by a justice of peace has been committed and that there is probable cause that defendant committed the offense, it not being required that guilt of defendant be established beyond a reasonable doubt (CL 1948, § 766.13).

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 6]  21 Am Jur 2d, Criminal Law §§ 449–451.
[3]  21 Am Jur 2d, Criminal Law § 343.
    Use in criminal case of testimony given on former trial, or preliminary examination, by witness not available at present trial.
    15 ALR 495, 79 ALR 1392, 122 ALR 425, 159 ALR 1242.
[4]  20 Am Jur, Evidence § 758.
[5]  20 Am Jur, Evidence § 755.
[7, 8]  8 Am Jur 2d, Automobiles and Highway Traffic §§ 984, 985.
    Opinion evidence as to speed of automobile or motorcycle.  70 ALR 540, 94 ALR 1190.
[9]  7 Am Jur 2d, Automobiles and Highway Traffic § 330.
[10]  7 Am Jur 2d, Automobiles and Highway Traffic § 337.
[11]  39 Am Jur, New Trial § 13.

2. SAME—PRELIMINARY EXAMINATION—EVIDENCE—DISCRETION OF MAGISTRATE.

The examining magistrate has a large discretion as to the extent and range of inquiry made when a person is brought before him for preliminary examination to ascertain whether a crime has been committed and whether there is probable cause to believe such person was guilty, and the strict rules of evidence may not be applied, where to do so would defeat the object of the inquiry (CL 1948, § 766.13).

3. EVIDENCE—PRELIMINARY EXAMINATION—UNAVAILABLE EXPERT.

Testimony of expert as to speed of defendant's car at time it was involved in alleged manslaughter of 8-year-old bicyclist, taken at preliminary examination *held*, properly ruled inadmissible at trial, notwithstanding unavailability of the expert at the time of trial, where there was a lack of certain facts showing in the record which might or might not have been supplied by the expert had he been available.

4. SAME—EXPERIMENTS—ADMISSIBILITY.

Experiments, made out of court, may be admitted into evidence even though not performed under identical conditions with those existing at time of occurrence if there is substantial similarity between conditions.

5. CRIMINAL LAW—MANSLAUGHTER—PRELIMINARY EXAMINATION—EXPERIMENT—EVIDENCE.

Testimony of experiment by police officer as to speed and braking distance of a car under substantially the same conditions as confronted defendant, charged with manslaughter by operation of a motor vehicle *held*, properly admitted at preliminary examination (CL 1948, § 766.13).

6. SAME—PRELIMINARY EXAMINATION—FINDINGS OF EXAMINING MAGISTRATE—EVIDENCE.

Examining magistrate properly bound defendant over to circuit court for trial on charge of manslaughter by operation of a motor vehicle, where evidence adduced at preliminary examination supported each of 2 findings by the magistrate, either of which would justify his action, it being found that defendant was driving his car while under the influence of intoxicating liquor which proximately caused the death of the decedent, and it being found the defendant operated his car with knowledge of a situation requiring the exercise of ordinary care and with ability to avoid the harm failed to do so when apparent result would be disastrous to another (CL 1948, §§ 750.324, 750.325).

7. SAME—EVIDENCE—OPINION TESTIMONY—EXPERIENCE OF EYEWITNESS.

Admission of opinion testimony that defendant, charged with manslaughter by operation of a motor vehicle, was operating his car much faster than the 35 miles per hour posted speed limit *held,* not prejudicial error notwithstanding the eyewitness so testifying was a 16-year-old boy who had previously only been a passenger in his father's car and had operated his own motor scooter, his lack of greater experience affecting the weight to be given his testimony by jury (CL 1948, §§ 750.324, 750.325).

8. SAME—EXAMINATION BY COURT—DISCRETION OF COURT—SPEED.

Questioning by court of 16-year-old boy, eyewitness to accident resulting in death of an 8-year-old girl bicyclist when hit by defendant's car, *held,* not an abuse of discretion in prosecution for manslaughter by operation of a motor vehicle, where it was done for purpose of shedding light on speed of defendant's car and witness was visibly confused by the rules of evidence but still qualified to present an opinion as to defendant's speed.

9. SAME—DRIVING CAR WHILE INTOXICATED—DIRECTED VERDICT—EVIDENCE.

Directed verdict on count charging defendant with having driven his car while under the influence of intoxicating liquor at a time when he was guilty of acts of gross negligence *held,* properly denied, in view of testimony adduced from police officers as to his condition immediately after accident in which an 8-year-old child was killed, other witnesses who had observed defendant drinking in the course of the afternoon, and defendant's own testimony.

10. SAME—MANSLAUGHTER—NEGLIGENT HOMICIDE—EVIDENCE.

Evidence presented in prosecution for manslaughter while operating an automobile in a grossly negligent manner and for negligent homicide *held,* sufficient to present issues for consideration of jury on both charges (CL 1948, §§ 750.324, 750.325).

11. SAME—MANSLAUGHTER—NEGLIGENT HOMICIDE—NEW TRIAL.

New trial was properly denied defendant, prosecuted on charge of manslaughter while operating a motor vehicle and convicted of negligent homicide, where record shows he had a fair trial (CL 1948, §§ 750.324, 750.325).

Appeal from Berrien; Zick (Karl F.), J. Submitted Division 3 December 7, 1965, at Grand Rapids. (Docket No. 9.)    Decided April 12, 1966.

Frank Seth Ray was convicted of negligent homicide.    Defendant appeals.    Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *John T. Hammond,* Prosecuting Attorney, and *Harry J. Creager,* Assistant Prosecuting Attorney, for the people.

*Killian, Spelman & Taglia (Paul A. Taglia,* of counsel), for defendant.

HOLBROOK, J.    Defendant was charged with manslaughter by operation of an automobile and convicted of negligent homicide[1] in the circuit court for Berrien county before a jury, June 27, 1962, and sentenced August 13, 1962.    Defendant's motion for a new trial was denied.    On appeal to this Court, defendant asserts error on four grounds:

(1) There was not sufficient competent evidence presented at the preliminary examination to sustain the examining magistrate's binding defendant to the circuit court and to thereafter justify the trial court's denial of the motion to quash timely made.

(2) The trial court erred in receiving testimony from the witness Michael Quirk relating to speed of defendant's automobile without a proper basis therefor, and in the court's questioning of Michael Quirk.

(3) The trial court erred in refusing defendant's motion for a directed verdict as to count 2, there not being sufficient, competent evidence to submit the issue of defendant's being under the influence of intoxicating liquor.

---

[1] CL 1948, §§ 750.324, 750.325 (Stat Ann 1954 Rev §§ 28.556, 28.557).—REPORTER.

. (4) The trial court erred in refusing defendant's motion for a new trial. (Confined on appeal to the first three claimed errors hereinabove.)

. The first issue to be considered is the sufficiency of the evidence produced at the examination to warrant binding the defendant over for trial in the circuit court. The test, upon preliminary examination, is stated by Mr. Justice CARR in the case of *People* v. *Asta* (1953), 337 Mich 590, on p 609 as follows:

"Under the statute relating to preliminary examinations (CL 1948, § 766.13 [Stat Ann 1954 Rev § 28.931]) the magistrate may bind a defendant, or defendants, over to the circuit court for trial if it shall appear from the proofs that an offense not cognizable by a justice of the peace has been committed, and that there is probable cause.for charging defendant, or defendants, therewith. In the instant case it was not required that the justice find the guilt of the defendants established beyond a reasonable doubt. *People* v. *Hirschfield,* 271 Mich 20, 27; *People* v. *Wilkin & Walsh,* 276 Mich 679, 687. It was essential, however, under the provisions of the statute, to determine that the offense charged had been committed, and that there was probable cause to believe that defendants .were guilty."

Gillespie in 1 Michigan Criminal Law and Procedure (2d ed), § 303, p 361, stated:

"All facts and incidents which plainly relate to the offense are admissible. In many cases the application of strict rules of evidence would go far to defeat the object of the inquiry. The examining magistrate must be allowed a large discretion as to the extent and range of the inquiry.[2] The magistrate does not act judicially in the technical sense, and the proceeding is one which, at common law,

---

[2] *Turner* v. *People* (1876), 33 Mich 363.

was conducted very much at the discretion of the magistrate."[3]

In reviewing the testimony presented at the preliminary examination, we find the following pertinent facts:

The time of the occurrence was June 21, 1961, about 4:30 in the afternoon. The scene was on M-60, an east and west highway, also known as Oak street, paved and 22 feet in width, with gravel berms of eight feet on each shoulder. The immediate scene was just a few feet outside the east city limits of Niles, Michigan. The weather was clear, warm, and sunny, and the pavement dry. Visibility was excellent for a considerable distance both east and west. The vicinity had commercial buildings on the north and residences on the south side of this street. A Standard service station was just north of the impact and two service stations and a shopping center were to the east thereof, and a Lutheran church to the north and west, among other buildings in the area. The approximate place of impact was near the center of the north half of the said street in front of the west driveway of a Standard service station and at the T intersection of said street (M-60) and 20th Place, a street intersecting said highway from the south. Defendant was driving his 1959 Cadillac convertible in a westerly direction on M-60 approaching the city of Niles. A speed limit sign of 35 miles per hour was posted on the north side of the highway a few hundred feet to the east and had to be passed by defendant prior to reaching the scene of the impact. The speed limit east of this area was 40 miles per hour.

The decedent, an eight-year-old girl, and her older brother were riding their bicycles at the scene. Michael Quirk, a 16-year-old boy, was riding his motor scooter on 20th Place going north and had

---

[3] *Hamilton* v. *People* (1874), 29 Mich 173.

stopped at the south side of M–60 or Oak street and saw decedent's brother finishing the crossing of the highway on his bike and entering the west driveway of the Standard service station, and also, observed the decedent apparently following her brother by a few seconds, crossing the highway, and momentarily going east in the center of the highway for a length of the bicycle before attempting the completion of crossing the highway to the north. When she was about in the center of the north portion of the pavement, she and her bike were struck by defendant's automobile and thrown in the air with great force. There was no sounding of a horn, but there was a loud screech of brakes and tires skidding. The decedent was thrown through the air and landed on the north berm of the road, approximately 150 feet west of the approximate point of impact. The bicycle finally stopped in the highway about a hundred feet west of decedent. The skid marks were plainly visible for 176 feet and started in front of the west drive of the Standard service station and proceeded west. The defendant's automobile finally stopped after turning around, evidently from the force of the stopping operation, after which it was driven to the south side of the road prior to the officer's arrival. The decedent was taken to the local hospital and expired as a result of the many injuries received.

The defendant after stopping his automobile, got out and went over on the north side of the highway and sat down on a piece of cement or rock where he was when trooper Beebe, the first officer, arrived. Officer Beebe testified that he noticed an unusual odor on the defendant and asked him if he had been drinking. Defendant replied that he had had a couple of beers. Another officer, Savoie, testified that he also smelled intoxicants on the defendant at the scene. Photographs of the scene, the automobile and the bicycle were introduced into evidence at the preliminary examination.

A Dr. Witte, doctor of physics and professor of physics at Notre Dame University, testified as an expert that in his opinion from certain facts given him, defendant was driving 56 miles per hour.

The testimony of Norman Schoenmaker, a State trooper, was to the effect that he came to the scene within an hour after the occurrence wherein the decedent was struck by defendant's automobile, and driving a 1960 coach police car, he drove in the same direction as defendant, and on the same highway, and in the same location, at a speed of 46 miles per hour, and applied his brakes, and skidded to a stop. A measurement of the skid marks that he made in this experiment was 136 feet in length.

The testimony of Dr. Witte given at the examination, when offered at the trial, by reason of Dr. Witte having moved to the west coast and being unavailable, was ruled inadmissible because of lack of certain facts showing in the record. The trial judge stated such facts may or may not have been supplied by Dr. Witte if he were available in person. This ruling of the trial judge was correct.

Because of Schoenmaker's unavailabilty, his testimony given at the preliminary examination was offered at the trial with the testimony of Dr. Witte. Upon Dr. Witte's testimony being ruled inadmissible, the people did not offer Schoenmaker's testimony separately.

Was the testimony of Schoenmaker's experiment properly admitted by the examining magistrate?

In 8 ALR 18, annotated, under title of Experimental evidence as affected by similarity or dissimilarity of conditions, pp 18, 26, it is stated:

"The general rule, as stated in the cases below cited, is that to render experiments permissible, or to admit evidence of experiments made out of court, the conditions need not be identical with those ex-

isting at the time of the occurrence, but that it is sufficient if there is a substantial similarity."[4]

"If the essential conditions under which the experiment or observation is made are substantially the same as those of the actual occurrence which is being investigated, any departure or minor variation goes to the weight rather than the admissibility of the evidence."

Also, see, 85 ALR 479, 480.[5]

In *Siegel* v. *Detroit Cab Co.* (1929), 246 Mich 620, an action for death of a pedestrian caused by being struck by an automobile at a street intersection where the pavement at the time of the accident was dry, and the driver of the car testified that when he first saw the deceased, he was 18 or 20 feet from the car and that he was not driving more than 12 or 13 miles an hour, it was held that evidence was properly admitted of witnesses for plaintiff ·who from tests made by them with a similar car, testified that if the brakes were in good condition when being driven 12 miles an hour, the car could be stopped within 2 feet when on a dry pavement. Also, see, 78 ALR2d 218, § 2, pp 220, 221.[6]

We conclude that the examining magistrate properly admitted the testimony of the experiment of officer Schoenmaker, bearing on the issue of speed.

The complaint and warrant charged defendant with manslaughter by operation of a motor vehicle, contrary to CL 1948, § 750.321 (Stat Ann 1954 Rev § 28.553).

Either of two findings by the examining magistrate would justify binding defendant over to the circuit court for trial:

---

[4] *Klanowski* v. *Grand Trunk Railway Company* (1887), 64 Mich 279; *People* v. *Auerbach* (1913), 176 Mich 23 (Ann Cas 1915A, 968).
[5] *Smith* v. *Grange Mutual Fire Insurance Co.* (1926), 234 Mich 119.
[6] *People* v. *Davis* (1955), 343 Mich 348.

(1) The driving by defendant of his motor vehicle while under the influence of intoxicating liquor which was the proximate cause of the death of the deceased, or

(2) By defendant causing the death of the decedent due to the operation of his automobile with these three elements present: (a) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (b) ability to avoid the resulting harm by the ordinary care and diligence in the use of the means at hand; and, (c) the omission to use such care and diligence to avert the threatened damage when to the ordinary mind it must have been apparent that the result was likely to prove disastrous to another.

After a careful review of the testimony given at the preliminary examination, together with the physical facts proven and logical inferences that could be drawn, even without Dr. Witte's expert testimony as to speed, we find sufficient evidence present to allow the examining magistrate to find that the crime had been committed and probable cause to charge the defendant therewith. Defendant was properly bound over to the circuit court for trial.

The next issue to be considered is the claimed error of the trial court in examining the witness Michael Quirk, the 16-year-old boy, and allowing him to testify as to speed of defendant's automobile. The pertinent testimony appears in the record as follows:

(By Mr. Lange, for people.)

"*Q.* In the course of your experience of driving a motor scooter, Mike, and of being a passenger in a motor vehicle, have you observed motor vehicles being driven at different speeds?

"*A.* Yes, I have.

"*Q.* And how many such observations would your best estimate be that you have made?

"*A*. Quite a few. I have done a lot of traveling with my dad.

"*Q*. Have you done a lot of driving with a motor scooter?

"*A*. Yes.

"*Q*. And that was over a period of how many years?

"*A*. It was about two years.

"*Q*. And based on your experience, can you tell whether or not the motor vehicle is being driven at a fast or slow rate of speed?

"*A*. Yes.

"*Q*. Now, on the day and time in question, could you tell, based on your prior experience, whether or not this Cadillac automobile was—strike that. At what rate of speed on the day and time in question, based on your prior experience, was this Cadillac automobile being driven?

"*Mr. Taglia:* Don't answer the question. I will object again on the same grounds, that the witness is not properly qualified to testify. There is no evidence that he is a licensed automobile driver. At this time, before the court rules, I would like to be heard outside the presence of the jury.

"*The Court:* Will you ask him one question, and depending on that answer I will rule. Ask him about how fast he drives his motor scooter.

"*Q*. What is the fastest speed you have ever driven your motor scooter?

"*A*. About 35. * * *

"*Q*. Are you acquainted, Mike, with this intersection of 20th Place and Oak? (M-60)

"*A*. Yes, I am, quite familiar.

"*Q*. How close do you live to that intersection?

"*A*. Just five houses down from Lewis Drive, which is one block.

"*Q*. How long have you lived there?

"*A*. About seven years.

"*Q*. During that time have you had the opportunity to observe the speed of vehicles traveling on Oak street on M-60?

"*A.* Yes.

"*Q.* And that observation has been made over a period of seven years?

"*A.* Yes.

"*Q.* And you state that this car was traveling faster than normal?

"*A.* Yes, it was.

"*Q.* And is your conception of normal speed based on seven years of observation?

"*A.* Yes.

"*Mr. Taglia:* Your Honor, same objection; and I move to strike the testimony.

"*The Court:* Let me inquire before I rule. Now, what is the speed limit in there?

"*A.* I believe it's about 35 by these gasoline stations.

"*The Court:* I think the evidence is that there is a speed sign down—that would be the bottom of the map.

"*A.* Yes.

"*The Court:* 35?

"*A.* Yes.

"*The Court:* Now, I will ask you whether or not, in your opinion, Michael—Can't you give the jury some idea in relation to the speed limit there?

"*A.* What do you mean? You want the speed limit of the area?

"*The Court:* No, can't you give an opinion as to the speed of this Cadillac in relation to what the speed limit is there, keeping in mind that the speed limit is 35?

"*A.* Well, it was faster than that. It was faster than the speed limit.

"*The Court:* Do you have any idea how much faster?

"*A.* Well, not exactly, but he appeared to be coming much more faster than what people usually come down there—you know, after while you can tell.

"*The Court:* You are saying that it was much faster than 35 miles an hour?

"*A.* Yes.

"*The Court:* I will allow that, and you may inquire further if you want to; but as to the defense counsel's objection as to 'faster than normal' the jury should disregard that because we don't know what that means. Maybe people driving normally in there could be 15 miles per hour—or could be 35 or 45, even though the speed limit may be 35. I want the jury to understand that; so the jury will disregard his testimony as to 'faster than normal.'

"*Mr. Taglia:* In order to clarify the ruling of the court—if I understand the court's ruling correctly, this witness' testimony to the effect that the automobile appeared to be coming 'much more faster than 35 miles per hour' is admissible?

"*The Court:* Yes, it is."

It is evident that the trial judge in questioning Michael Quirk was only endeavoring to have him testify as to matters within his knowledge. He had driven his motor scooter for two years and had driven it up to a speed of 35 miles per hour. He had also traveled a lot with his father and had thus gained knowledge as to the speed of automobiles. This qualified him to express an opinion as to the speed of defendant's automobile. The lack of greater experience would go to the weight but not to the admissibility of the testimony.

Mr. Tuttle, a garage man and for 26 years a driver of motor vehicles, testified that the speed of defendant's automobile at the scene was well over 50 miles per hour.

Defendant cites the case of *City of Grand Rapids* v. *Crocker* (1922), 219 Mich 178, in support of his position that the admission of the testimony was error. Even in the cited case where admitting the testimony was error, it was determined that where other testimony concerning speed was admitted, it was not prejudicial. However, the facts in the cited

case are not the same as in the case at hand. It is therefore not analogous and not applicable.

We conclude that the trial judge possessed the right in the conduct of the trial to question the witness, a boy of 16 years, for the purpose of shedding light on the speed of defendant's automobile where the witness was visibly confused by the rules of evidence but was still qualified to present an opinion. This was not an abuse of discretion. *People* v. *Fedderson* (1950), 327 Mich 213, and *People* v. *Salem* (1923), 224 Mich 114.

The third assignment of error to be considered is the claim that the trial judge should have granted defendant's motion for directed verdict as to count 2 for the reason that there was insufficient competent evidence to submit the issue of defendant's being under the influence of intoxicating liquor. The pertinent testimony in the record bearing upon this issue appears as follows:

Officer Beebe testified in part as follows:

"*Q.* What did he tell you?

"*A.* He said that he had had a couple of beers.

"*Q.* Did you have any further conversation with him regarding the use of intoxicants, other than what you testified to? Did you ask him where he had been drinking?

"*A.* Yes.

"*Q.* What did he tell you?

"*A.* He said he—I believe it was his daughter's birthday or something, and he had been over to his brother-in-law's house; and that is where he had the couple of beers.   *   *   *

"*Q.* How long have you been a police officer?

"*A.* It will be five years, five years next month.

"*Q.* And during that five-year period, officer, have you come in contact with persons who have been under the influence of intoxicants or alcoholic liquors?

"*A.* Yes.

"*Q*. On how many occasions, as near as you can tell?

"*A*. That is hard to say, the number of occasions. Quite a number.

"*Q*. And based on that five years of experience as a police officer and based on the observation you made that you testified to here, do you have an opinion as to whether or not the defendant was under the influence of intoxicants when you talked to him?

"*A*. In my opinion, he was under the influence."

Officer Savoie testified in part as follows:

"*Q*. How close were you to Dr. Ray during the course of this investigation?

"*A*. At different times I was within 2-1/2 to 3 feet.

"*Q*. Did you notice any unusual odor about his person?

"*A*. I smelled a smell of intoxicants on his person.

"*Q*. And where were you when you made that observation?

"*A*. The south edge of the road, just west of 20th Place, at which time Dr. Ray was seated in the patrol car."

Roy Huss, witness for the people, testified in part as follows:

"*Q*. I take you back to the 21st day of June, 1961, at approximately 4 p.m. in the afternoon, and ask you where you were at that time.

"*A*. Lake Shore Lounge, Barron lake.

"*Q*. And that is at Barron lake?

"*A*. Yes.

"*Q*. What kind of an establishment is that?

"*A*. It's a liquor and beer tavern.

"*Q*. Are you acquainted with the defendant, Dr. Ray?

"*A*. Yes.

"*Q*. Did you see him on that occasion?

"*A*. Yes.

"*Q.* Approximately what time did you arrive at the Lake Shore Lounge?

"*A.* Approximately 3:30.

"*Q.* Who was with you, if anyone?

"*A.* My wife.

"*Q.* Was Dr. Ray in the establishment at the time you arrived?

"*A.* Yes.

"*Q.* Did you see him leave the establishment?

"*A.* Yes.

"*Q.* Approximately what time did you see him leave?

"*A.* It was in the neighborhood of 4 o'clock.

"*Q.* Now, during the time that you observed him in the Lake Shore Lounge at Barron lake did you observe him consuming any alcoholic beverage?

"*A.* I seen him order one.

"*Q.* Do you recall what type of drink it was?

"*A.* It was a mixed drink—whiskey.

"*Q.* Did you see the bartender pour whiskey into the glass?

"*A.* Yes.

"*Q.* When you arrived, Dr. Ray was already there?

"*A.* Yes.

"*Q.* And at the time you arrived did he have some drink or liquid in a glass at his table?

"*A.* Yes. * * *

"*Q.* What did you see him have when you arrived?

"*A.* Something in a glass.

"*Q.* You don't know what it was?

"*A.* No. * * *

"*Q.* Do you recall anything unusual about the doctor's appearance that day?

"*A.* He was playing shuffleboard.

"*Q.* Can you describe his conduct to the jury.

"*A.* He was noisy, but nothing out of the ordinary.

"*Q.* Was he noisy at shuffleboard?

"*A.* He was hollering at his partner. * * *

"*Q.* Have you drunk on occasions intoxicating liquors?

"*A.* Yes.

"*Q.* How long have you drunk them?

"*A.* Probably 20 years.

"*Q.* And have you seen persons under the influence of intoxicants?

"*A.* Yes.

"*Q.* And has that been an experience you have had on several occasions?

"*A.* Yes.

"*Q.* Do you have an opinion, Mr. Huss, based on your experience and your observation at Lake Shore Tavern that afternoon as to whether or not Dr. Ray was under the influence of intoxicants?

"*A.* Yes.

"*Q.* What is that opinion?

"*A.* I wouldn't say he was drunk, but he was drinking."

Mrs. Huss testified in part as follows:

"*Q.* Mrs. Huss, I take you back to the 21st day of June, 1961, and ask you where you were at about 4 o'clock that afternoon?

"*A.* I was out at Avalon Market or Lounge.

"*Q.* And where is that located?

"*A.* Barron lake.

"*Q.* What time did you arrive there?

"*A.* It was after 3.

"*Q.* Are you acquainted with Dr. Ray?

"*A.* I know him.

"*Q.* Did you see him there on that occasion?

"*A.* I did.

"*Q.* Was he there when you arrived?

"*A.* Yes.

"*Q.* Was there anyone in his company?

"*A.* There was a man with him.

"*Q.* Did you see whether or not he consumed any liquid on that occasion?

"*A.* He was drinking, yes.

"*Q*. Do you know what he was drinking?

"*A*. It was a mixed drink.

"*Q*. How many mixed drinks did you see him drink?

"*A*. He had a drink in front of him when we got there, and he had ordered one more and finished a game of shuffleboard and left.

"*Q*. Can you tell the court and the jury approximately what time Dr. Ray and his companion left?

"*A*. I think they left around 4—maybe a few minutes after. I know he wasn't there very long after we arrived there."

Officer Jack Paul testified in part as follows:

"*Q*. Officer, do you know approximately what time of day you arrived at the scene?

"*A*. Approximately 4:45 or 4:50.

"*Q*. Do you know approximately what time it was that the defendant got into the patrol car?

"*A*. It would be within five minutes of that time.

"*Q*. Did you notice any unusual odor about his person at that time?

"*A*. I could detect the odor of alcoholic beverages on his breath."

The defendant testified in his own behalf and the record in part discloses the following:

"*Q*. Doctor, I take you back to the 21st day of June, 1961, and ask you if you can reconstruct the events of that day immediately prior to the accident which occurred about 4:30 p.m. Initially, I ask you do you recall where you were at or about noon on that particular day?

"*A*. Yes.

"*Q*. Tell the court and jury where you were at that time.

"*A*. I had been to the hospital to visit patients; and I met two doctors that I am closely associated with; and one of them—

"*Q*. Who are they?

"*A.* Dr. Fox and Dr. Ikert.

"*Q.* Where did you meet them that day?

"*A.* At the hospital. They were making rounds, and I saw them while I was at the hospital.

"*Q.* Did you go anywhere with them after you left the hospital?

"*A.* Dr. Fox, I believe, suggested we go down to Eddie's Restaurant and have lunch. He said, 'We will have to hurry because I have a tee-off time at Morris Park Country Club to play golf at 1:15.

"*Q.* Did you go to Eddie's Restaurant?

"*A.* Dr. Fox and Dr. Ikert and I went to Eddie's Restaurant.

"*Q.* Did you eat lunch there?

"*A.* No, sir.

"*Q.* What happened there?

"*A.* By the time we got into the restaurant it was probably a little after 12. A crowd was coming in, and Dr. Fox had this early tee-off time; so he suggested we go in and have a drink; so Dr. Fox and Dr. Ikert and I went in and had a beer. In the meantime, Dr. Fox kept checking his watch to make sure he wasn't going to be late at the country club.

"*Q.* Did anyone order another drink?

"*A.* Dr. Fox did; and when the waitress came he said, 'I won't have time to stay—I'm going to have to leave.' So I suggested to Dr. Ikert that we might as well leave, too. I don't remember whether we finished the beer that came to the table or whether we got up and left without finishing it.

"*Q.* You remember having one full bottle of beer?

"*A.* Yes.

"*Q.* And you aren't sure if you finished the second?

"*A.* No.

"*Q.* But you do know you did drink something from the second beer?

"*A.* Yes.

"*Q.* What did you do then, Doctor?

"*A.* I had told Dr. Ikert that we were having a birthday party for the children that afternoon at

Dr. Dill's house down in Niles. We were going down there because they have a swimming pool and the kids could have more fun.   *   *   *

"*Q*. What time do you think you arrived at Cassopolis and picked up the children with Dr. Ikert?

"*A*. About 2 o'clock.

"*Q*. Did you then proceed on to Niles?

"*A*. We had the top down on the car. The kids were hollering, 'It's hot back here' and they wanted a pop or something; so we—there was a grocery store in the vicinity of the Avalon, Barron lake. I said, 'Wait until we get to the Avalon, and I will get some pop.'

"*Q*. Is this grocery store a part of the same building?

"*A*. It is in the same building.

"*Q*. Did you, in fact, go in?

"*A*. Yes.

"*Q*. What did you do inside?

"*A*. Well, I went into the bar there to go to the men's room while they were getting pop for the children; and when I came out Dr. Ikert and Mrs. Ray were sitting at a table having a drink.

"*Q*. Did you have a drink?

"*A*. No.   *   *   *

"*Q*. Did you have anything to drink while you were at this party?

"*A*. No. The swimming pool—there's an entrance from the basement to the pool, and as I—the children were running in and out and getting dressed after going out and back down the steps and going back up to make sure that somebody was watching them; and I came back downstairs once into the basement. Mr. Deam and Dr. Dill were having a beer; and there was one open, and they said, 'We will open a beer.' I said, 'I don't want one; I'm watching the kids.' So I didn't have one.   *   *   *

"*Q*. Did you pick up the medical bag?

"*A*. He stayed in the car, and I got out and went in and picked up my bag and came directly back out and got back in the car, and we started back

for Niles; so we probably weren't stopped over two minutes or three minutes.

"*Q.* Then you started back toward Niles?

"*A.* Yes.

"*Q.* Did you come directly back to Niles?

"*A.* No, we stopped at the Avalon.

"*Q.* Did you go inside?

"*A.* Yes.

"*Q.* What did you do inside the Avalon?

"*A.* Went in to play shuffleboard.

"*Q.* Now, Dr. Ray, you were present in court when Mr. Huss and Mrs. Huss testified, were you not?

"*A.* Yes.

"*Q.* You heard their testimony?

"*A.* Yes.

"*Q.* I ask you, Doctor, did you have a drink of any kind while you were at the Avalon?

"*A.* I didn't drink a drink."

Under count 2, defendant was charged with having driven his automobile while under the influence of intoxicating liquor at a time when he was guilty of acts of gross negligence. The jury was instructed that they could not find defendant guilty of manslaughter because of such intoxication alone, if they did so find, unless they also found defendant guilty of one or more of the charged acts of negligence causing the death of deceased.

Two officers testified in their opinion, defendant was under the influence of intoxicating liquor. One of the officers stated defendant told him that he had had two beers at Niles at the party that afternoon. Defendant said he had one or two beers at noon while waiting for lunch. Two witnesses observed him drinking mixed drinks at the Avalon bar just a few minutes before the death of the deceased. This evidence was admitted and properly so, and the jury, the triers of the facts, had an opportunity to observe the demeanor and the manner of testify-

ing by the various witnesses. We conclude there was sufficient evidence on intoxication of the defendant to submit it to the jury in count 2, and apply to this case the reasoning stated in the case of *People* v. *Layman* (1941), 299 Mich 141, pp 146, 147, where Mr. Chief Justice Sharpe stated as follows:

"The trial court also instructed the jury upon the question of gross negligence as above noted. These instructions were taken from what we said in the *Orr Case*.[7] Under the test as laid down in that case, defendant as a driver on the highway had knowledge of a situation requiring the exercise of ordinary care and diligence to avoid injury to another. He had the ability to avoid the resulting harm by the use of ordinary care and diligence in the use of his automobile and there was evidence that defendant was intoxicated and driving at the rate of 55 miles per hour as he was entering the intersection. From such testimony, a jury could determine that defendant failed to use such care and diligence to avert the threatened danger when to an ordinary mind it must have been apparent that the result was likely to prove disastrous to another.

"There was evidence from which a jury could determine that defendant was guilty under either theory as outlined by the trial court. The weight to be given to the evidence introduced is the problem of the jury and we cannot say that its verdict was contrary to the law of evidence in criminal cases."

Originally, there were 5 counts contained in the information: The first 3 charged involuntary manslaughter and the last 2 negligent homicide. Count 1 charged defendant with negligently and unlawfully driving his motor vehicle while under the influence of intoxicating liquor and causing the death of decedent. This count was dismissed upon motion of

---

[7] *People* v. *Orr*, 243 Mich 300.—Reporter.

defendant upon close of the proofs. Counts 2 and 3 charged defendant with manslaughter in that he operated his automobile in such a manner so as to be guilty of gross negligence, and caused the death of the decedent. The allegation as to defendant being under the influence of intoxicating liquor was not contained in count 3. Counts 4 and 5 charged negligent homicide, and count 5 was dismissed on motion of the people.

Defendant has not raised objection nor briefed the law concerning the submission by the court to the jury of counts 3 and 4. Upon review of the record, we believe the evidence was sufficient and presented issues of fact to be determined by the jury both as to the charges of manslaughter by operation of a motor vehicle and negligent homicide.

We conclude that the defendant's three stated claims of error are without merit. Lastly, defendant asserts that the trial judge should have granted a new trial based upon the 3 grounds of error herein set forth. Our ruling herein precludes granting a new trial. The record satisfies us that the defendant had a fair trial. There was no prejudicial error committed and the judgment of conviction is affirmed.

FITZGERALD, P. J., and T. G. KAVANAGH, J., concurred.